[No. F019030. Fifth Dist. Jan. 18, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
RAMON A. ESTRELLA, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I and III.

COUNSEL

Charles A. Pacheco, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Edgar A. Kerry and Louis M. Vasquez, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BUCKLEY, J.**—At a jury trial defendant was convicted of being a felon in possession of a firearm (count one, Pen. Code, § 12021, subd. (a)); driving recklessly while fleeing from a police officer (count two, Veh. Code, § 2800.2); and auto theft with an armed enhancement (count three, Veh. Code, § 10851, subd. (a), Pen. Code, § 12022, subd. (a)(1)). At a bifurcated trial before the court, it was found that defendant suffered a prior conviction and served a separate prison term therefor as to all three counts within the meaning of Penal Code section 667.5, subdivision (b). From his conviction and sentence, defendant appeals. We will affirm.

### FACTS

While on duty in the afternoon of June 12, 1992, senior Police Officer Kristen Borton was in an unmarked white Buick car, wearing plain clothes.

She began to follow a white Toyota[1] as it turned eastward and then turned southbound onto Chester Avenue. By way of a hand-held instrument she transmitted information regarding her location and progress to the communication center as well as to other officers who were monitoring their radios. By the time the Toyota led her westbound on 21st Street, Borton could hear sirens but could not see any other police vehicles.

Borton continued her pursuit of the Toyota, which turned northbound on "Eye" Street. At that point Sergeant David Haskins, driving a white Chevrolet Caprice with a light bar and siren, advised Borton by radio that he was following her. Borton then turned to the right to permit Haskins to follow the Toyota because Haskins's car had a light bar and siren. Thereafter, Borton observed the Toyota pass through the intersection of "Eye" Street and 23d without any reduction in speed despite the presence of a stop sign. Borton observed similar conduct at the intersection of "Eye" Street and 24th, where the Toyota proceeded past the stop sign at about 40 or 45 miles per hour. A westbound vehicle collided broadside with the Toyota. The occupant of the Toyota crawled out of a window and began to run in a northwesterly direction. Borton observed the person from a distance of about 40 feet and at trial was able to identify defendant as the person. In her car Borton pursued defendant to a dirt field where other officers took defendant into custody after defendant cut across the field and jumped a fence.

During the pursuit Borton dressed herself in a bulletproof vest and was putting on a gunbelt and a teddy, or covering for the vest, which bore the word "Police." She observed defendant looking into his rearview mirror while she was dressing.

Although Haskins was dressed in plain clothes, he wore a Bakersfield Police Department vest with a cloth badge, a gunbelt, and a navy blue baseball cap with the word "Police" across the front in bright yellow lettering.[2]

Borton's vehicle was a white 1983 Buick owned by the police department; there was nothing distinctive about it to identify it as a police vehicle. Haskins was driving a 1989 white Chevrolet Caprice with a light bar inside the windshield on the front passenger side. Its siren was not visible from the outside. It had alternating headlights (called "wigwag" lights) and warning lights to the rear. The light bar was eighteen inches long and four or five

---

[1] It was stipulated that the police had reasonable cause to pursue the vehicle.

[2] Other officers who were present were not shown to be in uniform or marked vehicles. Officer Payne was a probation officer who wore street clothes and drove an unmarked gray 1986 GMC Blazer. As to Officers Brewster and Helton, there is no direct evidence regarding their attire. Brewster was in an undercover car. Helton drove an unmarked silver pickup.

inches from top to bottom. It had a steady red light in the middle, a flashing blue light on one side, and a flashing red light on the other. It was permanently mounted in the vehicle behind the windshield pointing forward, in the vicinity of the passenger side sun visor.

The wigwag was internal; it operated the headlights. Haskins stated that the vehicle was not a normal patrol vehicle, or "black and white." Those cars have light bars on the top of the vehicle which are about five feet across. Thus, one can identify a normal patrol vehicle from a distance of hundreds of yards. The spotlights on Haskins's car were about five or six inches in diameter and were of a type that could be installed on any vehicle. There was no writing or sign on the vehicle or anything else to indicate what agency owned the vehicle. Haskins confirmed that if the lights were off, one observing the vehicle from the front would not see anything that identified the car as a police vehicle unless that person paid close enough attention to notice the light bar inside. However, Haskins had never seen a passenger car light up as his car did when he was following defendant. The light bar was designed to be seen by someone he was following.

Upon pulling in behind Borton's car, Haskins turned northbound onto "Eye" Street and activated the emergency lights (the steady red and flashing blue and red lights on the light bar), the alternating lights (wigwags) and the siren. Haskins continued to follow the Toyota, which accelerated from 30 to 35 miles an hour to about 50 miles per hour. It failed to stop for the posted stop signs at "Eye" Street and 23d and then "Eye" Street and 24th. Haskins estimated the Toyota's speed when it ran the stop sign at 24th was 55 to 60 miles per hour. The Toyota did not pull over, yield or park even though there were ample opportunities to do so.

After defendant left the Toyota and ran northbound, Haskins continued pursuing defendant in his vehicle with the siren and red lights going. Defendant ran along a sidewalk to a dirt parking lot, which he cut across in a northwesterly direction. Haskins stopped his patrol car at the curb, got out of his vehicle, and yelled in a loud voice at defendant, telling him that he was a police officer and demanding that defendant stop. Although defendant was only 25 or 30 feet away, he kept running away from the officer. Haskins observed defendant run northbound across 25th Street and then heard a shot from Officer Payne's vehicle. Defendant fell to the ground, where he was later taken into custody.

After defendant's arrest, officers found a nine-millimeter semiautomatic handgun on the front passenger seat of defendant's vehicle. The weapon was operable and was loaded with one unexpended round in the chamber and fourteen in the magazine; the safety was "on."

## Discussion

### I. Service of Prior Prison Term*

. . . . . . . . . . . . . . . . . . . . . . . . .

### II. Conviction of Vehicle Code Section 2800.2[3]

Section 2800.2 provides: "If a person flees or attempts to elude a pursuing peace officer in violation of Section 2800.1 and the pursued vehicle is driven in a willful or wanton disregard for the safety of persons or property, the person driving the vehicle, upon conviction, shall be punished by imprisonment in the state prison, by imprisonment in the county jail for not more than one year, or by a fine of not less than one hundred seventy dollars ($170) nor more than two thousand dollars ($2,000), or by both that fine and imprisonment."

Section 2800.1 provides:

"Any person who, while operating a motor vehicle and with the intent to evade, willfully flees or otherwise attempts to elude a pursuing peace officer's motor vehicle, is guilty of a misdemeanor if all of the following conditions exist:

"(a) The peace officer's motor vehicle is exhibiting at least one lighted red lamp visible from the front and the person either sees or reasonably should have seen the lamp.

"(b) The peace officer's motor vehicle is sounding a siren as may be reasonably necessary.

"(c) The peace officer's motor vehicle is distinctively marked.

"(d) The peace officer's motor vehicle is operated by a peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 of the Penal Code, and that peace officer is wearing a distinctive uniform." (Stats. 1988, ch. 504, § 1, p. 1918.)

#### A. Distinctively Marked Vehicle

 Defendant argues that the vehicles were unmarked, which omission is fatal to his conviction of section 2800.2. The People counter that

---

*See footnote, ante, page 716.

[3]All statutory references are to the Vehicle Code unless otherwise noted.

Haskins's car was "distinct from average street cars" as it was equipped with spotlights on both sides, a permanently stationed 18-inch light bar inside the windshield on the front passenger side, a siren, alternating headlights (wig-wag lights), warning lights at the rear of the car, and a push-bar on the front of the vehicle. The People respond that even assuming that these items did not distinguish the vehicle from other vehicles (while not activated), once the lighting equipment and sirens were turned on, it could not reasonably be said that the vehicle was not "distinctively marked."

Section 2800.2 incorporates, and thus expressly requires, a violation of section 2800.1. It must be determined whether or not Haskins's vehicle was "distinctively marked" within the meaning of section 2800.1, subdivision (c).

Provisions of the Penal Code are to be construed according to the fair import of their terms, with a view to effect their objects and to promote justice. (Pen. Code, § 4.) In construing a statute, this court is to ascertain the intent of the Legislature in order to effectuate the law's purpose. The court should first turn to the words used in the statute. When the statutory language is clear and unambiguous, there is no need for construction, and the court should not undertake it. (*People* v. *Overstreet* (1986) 42 Cal.3d 891, 895 [231 Cal.Rptr. 213, 726 P.2d 1288].) It must be determined whether the words of the statute, given their ordinary and popular meaning, are reasonably free from uncertainty or ambiguity. (*People* v. *Mel Mack Co.* (1975) 53 Cal.App.3d 621, 626 [126 Cal.Rptr. 505].)

Something is distinctive if it serves to distinguish or set apart. (See Webster's Third New Internat. Dict. (1986) p. 659.) The adjective "marked" means having a mark of a specified kind, or having a distinctive or strongly pronounced character. (See *id.* at p. 1383.) A "mark" is a character, device, label, brand, seal, or other sign put on an article, especially to show the maker or owner, to certify quality, or for identification. (See *id.* at p. 1382.) The word is used here in the context of a list of conditions relating to the appearance of officers and their vehicles. It may reasonably be concluded that a vehicle is distinctively marked if it bears a symbol or device that identifies it as a peace officer's vehicle.

While initial reaction to the term "distinctively marked" may be to construe a requirement of insignia or logo, we note the absence of an express requirement of the same in section 2800.1, thereby lending credence to a liberal (and less literal) interpretation of the term.

It is established that a court should ordinarily reject interpretations that render particular terms of a statute mere surplusage; instead, the court should

give every word some significance. (*City of San Jose* v. *Superior Court* (1993) 5 Cal.4th 47, 55 [19 Cal.Rptr.2d 73, 850 P.2d 621].) Therefore, to construe "distinctively marked" to mean simply exhibiting a red light and sounding a siren would result in section 2800.1, subdivision (c) (requiring the vehicle to be "distinctively marked") being considered as mere surplusage.[4]

However, although we agree that a red light and siren alone do not distinctively mark a police vehicle, we conclude that under the circumstances presented here, the additional "devices" (see Webster's definition, *supra*) consisting of wigwag lights and the flashing blue and clear lights adequately identified Haskins's vehicle as a police vehicle.[5] We find it incredible to believe or even seriously argue that a reasonable person, upon seeing a vehicle in pursuit with flashing red and blue lights, wigwag headlights and hearing a siren, would have any doubt that said pursuit vehicle was a police vehicle.

We consider this interpretation of the statute to be far more consistent with legislative intent than the alternative interpretation which would require some letter marking or insignia expressly designating the vehicle as a police vehicle. While on its face also reasonable, this "requirement" is less cogent when one considers the unlikelihood of a fleeing felon in the nighttime being able to distinguish any writing or insignia on the side or rear of a police vehicle in pursuit.

Accordingly, we adopt a commonsense approach to this question, one which looks at the indicia identified with the pursuit vehicle which are supplemental to a red light and siren, to ascertain whether a person fleeing is on reasonable notice that pursuit is by a peace officer. Stated somewhat differently, under section 2800.1, does the person know or reasonably should know that a police vehicle is in pursuit?

Here, the defendant was on such notice.

---

[4]Although the legislative history of section 2800.1 does not reflect the reason for the statute's requirement the vehicle be distinctively marked, it is not mere speculation to assume that the purpose is to protect the public at large and women in particular from being required to stop for anyone at night flashing a red light and sounding a siren. Indeed, in *People* v. *Chessman* (1959) 52 Cal.2d 467 [341 P.2d 679], defendant Chessman, who became known as the "red-light bandit," would flash a red spotlight on a car, and when the vehicle would yield, Chessman would rob and/or rape the driver.

[5]We do not consider the presence of a push-bar on the front of the vehicle or spotlights mounted on each side as being significant identifiers of police vehicles. We take judicial notice of the proliferation of push-bars on all types of vehicles, particularly trucks and four-wheel drive vehicles. Moreover, section 24404 expressly allows the use of spotlights by nonemergency vehicles if the lights are of the correct power and are properly directed.

### B. *Distinctive Uniform*

■ As an alternative attack on the sufficiency of the evidence to convict under section 2800.2, defendant argues that Borton's vest bearing the word "Police" cannot qualify as a distinctive uniform because a reasonable person would not associate a vest as a police uniform and because one driving in front of such a uniformed officer cannot reasonably be expected to see the letters written on the vest.

The statute requires only that the peace officer be wearing a "distinctive uniform." Defendant does not point to any related provision of law that would define "uniform" in a manner that would exclude either Borton's vest or Haskins's police department vest, cloth badge, gunbelt and navy blue baseball cap marked "Police" in bright yellow lettering.[6] A "uniform" is dress of a distinctive design or fashion adopted by or prescribed for members of a particular group and serving as a means of identification. (See Webster's Third New Internat. Dict., *supra*, p. 2498.) Something is distinctive if it serves to distinguish, or sets something apart from others, or if it is characteristic of or peculiar to its type. (See *id.* p. 659.)

Here, Borton's bulletproof vest and Haskins's attire qualify as parts of police uniforms. The statute does not require that the uniform be of any particular level of formality or that it be complete.[7]

Defendant's assertion that a reasonable person would not consider a vest as a police uniform lacks support in either logic or experience. Further, the word "Police" and a badge are distinctive ways of identifying the wearers as police. Finally, there is no requirement in the statute that the person eluding capture actually see that the police officer is wearing a distinctive uniform. Here, Haskins's badge and the lettering across the front of his police cap would be reasonably visible.

■ With respect to defendant's claim of insufficiency of the evidence, it is established that in reviewing the sufficiency of the evidence, an appellate

---

[6]To the contrary, Government Code section 50081 includes protective vests as equipment to be provided to some peace officers.

[7]As enacted in 1977, section 2800.1 required that the officer be wearing a "complete, distinctive peace officer's uniform and appropriate badge." (Stats. 1977, ch. 1104, § 1, p. 3527.) As enacted in 1978, the section required only that the officer be wearing "a distinctive uniform." (Stats. 1978, ch. 504, § 1, p. 1649.) Legislative materials indicate that the change was prompted by dismissal of cases when some item of uniform, such as a hat, was not worn. (Assem. Dig. of Sen. Bill No. 1969 (May 4, 1978) p. 1; Bill Analysis of Sen. Bill No. 1969 as amended May 1, 1978, by the Assem. Com. on Crim. Justice; Sen. Com. on Judiciary (1977-1978 Reg. Sess.) Rep. on Sen. Bill No. 1969 as amended May 1, 1978.) Thus, neither the plain meaning of the present statute nor legislative background would support the notion that a complete or full uniform is required.

court must draw all inferences in support of the verdict that reasonably can be deduced and must uphold the judgment if, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. (*People* v. *Jackson* (1989) 49 Cal.3d 1170, 1199-1200 [264 Cal.Rptr. 852, 783 P.2d 211].) Substantial evidence is evidence of ponderable legal significance, reasonable in nature, credible and of solid value. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

▆▆▆ Here, the officers' testimony regarding the attire of the pursuing officers was essentially uncontradicted and constituted credible evidence. Defendant's contention is rejected.[8]

III. *Sentence for Violating Section 10851**

. . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Ardaiz, Acting P. J, and Dibiaso, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 12, 1995.

---

[8]It appears the trial court neglected to instruct the jury that the officer had to be wearing a distinctive uniform. The People note that defendant does not raise this argument but asserts that any error in that regard would not be prejudicial because (1) there was no contrary evidence regarding the clothing worn by the officers, and (2) the uniform requirement was plainly established. We agree that the evidence was established as a matter of law. (*People* v. *Banks* (1983) 147 Cal.App.3d 360, 367 [195 Cal.Rptr. 101].)
 *See footnote, *ante*, page 716.