Filed 2/14/14  P. v. Sanchez CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B243566 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA361738) |
| v. | |
| OMAR SANCHEZ et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Sam Ohta, Judge.  Affirmed and remanded.

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant Omar Sanchez.

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant Alex Chavarin.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Toni R. Johns Estaville, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants, Omar Sanchez and Alex Chavarin, appeal their convictions for kidnapping for ransom, possession of a firearm by a felon (Chavarin only), extortion (Chavarin only), evading an officer (Sanchez only), evading an officer against traffic (Sanchez only), and leaving the scene of an accident (Sanchez only), with a prior prison term enhancement (Sanchez only) (Pen. Code, §§ 209, subd. (a), [former] 12021, 520, 667.5; Veh. Code, §§ 2800.2, 2800.4, 20001).[1] Sanchez was sentenced to a prison term of seven years to life plus three years and eight months. Chavarin was sentenced to a prison term of seven years to life.

The judgments are affirmed and Chavarin's case is remanded for further proceedings.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

Felipe Olascoaga owned a market, sold cars and rented out party supplies. He also owned various parcels of real estate. However, owing to the recession, he was on the verge of bankruptcy. On Saturday, August 29, 2009,[2] while delivering party equipment, Olascoaga was kidnapped and beaten at gunpoint by three men, one of whom was defendant Chavarin. These men drove Olascoaga to a residential building on West 57th Street and took him to one of the apartments. Inside the bathroom, his clothes were cut off with a knife, and his money, ring and watch were taken. He was placed inside the bathtub, handcuffed to a bar, and the tub was filled with water. He was beaten some more.

---

[1]     All further references are to the Penal Code unless otherwise specified.

[2]     All further date references are to the year 2009 unless otherwise specified.

An hour later, defendant Sanchez arrived and spoke to Olascoaga. Sanchez seemed to be the boss because the other men covered Olascoaga's face with a towel every time Sanchez came to the apartment. Sanchez called Olascoaga's wife, Estela Espinoza, and demanded $250,000. He said if she did not come up with the money "they would kill [Olascoaga] and they would also go after her." Olascoaga told Sanchez he did not have that kind of money because his properties were in foreclosure. Sanchez told him to sell his cars and his business right away because they wanted the money by the next day.

Olascoaga was held prisoner for the next four or five days. At one point he was placed face down in the bedroom so the residents of the apartment could bathe. Each day Sanchez and the other men pressured Olascoaga about the money. He was beaten and kicked, and Sanchez burned him with a cigarette. Sanchez called Espinoza at least three times a day about paying the ransom.

When the ransom had not been paid by the Sunday deadline, Sanchez told Olascoaga "that at the very least I had to give him a hundred thousand dollars and . . . when I got out, he was going to be watching me. And that I would later have to give him the rest of the money." On Monday, Sanchez had a pair of pliers and he told Olascoaga to choose which finger he wanted cut off "so they could send it to my wife so she would know that they weren't joking around." Sanchez tried unsuccessfully to cut off one of Olascoaga's fingers.

Espinoza testified she received a series of phone calls from an unidentified man. In the first call, the man announced they had her husband. During a second call, the man put Olascoaga on the phone. Olascoaga cried and screamed as he was being beaten. The caller threatened to kill her husband if Espinoza did not deliver $250,000. In subsequent calls the man urged Espinoza to hurry up and get the money together. On Monday, the police began recording these phone calls.

Late Tuesday night, or early Wednesday morning, after the other men left the apartment, Chavarin told Olascoaga he had learned the others were going to cut off Olascoaga's hand and send it to either Espinoza or the police. Chavarin indicated

3

he had undergone a change of heart and offered to free Olascoaga if Olascoaga paid him some money. Olascoaga testified: "Something touched [Chavarin's] heart," and "he was going to help me get out of there" if Olascoaga gave him "whatever I had." Olascoaga promised to give Chavarin whatever money his wife had managed to collect. According to Olascoaga, Chavarin "was very nervous and he was sweating a lot. And . . . he spent about 20 to 30 minutes talking to me. He would leave the bathroom to go to the living room. And then he would come back and he would say, 'Yes, yes, I'm going to get you out.' "

Chavarin removed Olascoaga's handcuffs with a wire and let him out of the bathtub. He gave Olascoaga a loaded gun "[b]ecause he told me that he was . . . afraid that his partners might be outside and they would kill us and him, too." Olascoaga and Chavarin left the apartment. Olascoaga returned the gun to Chavarin after they discovered there was nobody outside the building. Olascoaga contacted Espinoza, who said she had managed to collect some money. This money was conveyed to Olascoaga, who gave Chavarin about $29,000. Olascoaga also gave Chavarin a pickup truck.

Sanchez's former girlfriend listened to the recorded calls made to Espinoza's phone and identified the caller as Sanchez.

On September 3, at 11:55 p.m., police officers attempted to make a traffic stop on Sanchez. Officer Nelson Fong testified two police vehicles were involved. He described these as "dual-purpose" vehicles: "They are Ford Crown Victorias. They're not marked black and white or anything that says 'Police' on it other than having a forward-facing red light and a rear amber light." One of the vehicles pulled up alongside Sanchez's car and the other vehicle pulled right behind him. Sanchez looked at the officers and "then he just took off." The officers activated their front and rear emergency lights, and their sirens, and pursued Sanchez. After traveling a block and a half, Sanchez drove the wrong way up an off ramp of the 10 freeway and then continued driving in the wrong direction on the freeway. Fong testified the officers chased him with "our emergency lights and sirens on, trying to

4

warn . . . potential drivers coming our way." After a little more than a mile, Sanchez's car hit a median and crashed into a minivan. Sanchez left his car and jumped from a freeway overpass, landing on the ground 40 or 50 feet below, where he was apprehended.

Chavarin was arrested on November 11 near the Mexican border.

2. *Defense evidence.*

Chavarin did not present any evidence.

Sanchez testified in his own defense. He denied it was his voice on the recorded phone calls demanding money from Espinoza. He acknowledged these phone calls had been made from a phone belonging to him, but he claimed he had given this phone to his brother prior to the kidnapping.

Sanchez testified he had used methamphetamine shortly before getting into his car the night he was stopped by the police. At first he was unaware the police were trying to pull him over; he just panicked when he saw a car right behind him. But then, as he was driving up the off ramp, he "realized that they were police, but it was a little too late for me to stop. I was already on the freeway." Sanchez testified: "I see the lights, and . . . it was too late for me to stop. [¶] Q. You noticed [that it was the police] as you were entering the onramp . . . . [¶] A. Yeah." Sanchez also testified he was consciously trying to get away from the police because "I wanted to spend my birthday with my son."

**CONTENTIONS**

1. Sanchez's Vehicle Code convictions must be reversed for insufficient evidence.

2. The trial court erred by not staying Chavarin's sentence for extortion.

3. Chavarin may be entitled to additional presentence custody credits based on his custody in Mexico.

5

**DISCUSSION**

1. *There was sufficient evidence to support Sanchez's convictions for evading the police.*

Sanchez contends his convictions for evading an officer and evading an officer against traffic (Veh. Code, §§ 2800.2, 2800.4) must be reversed because there was insufficient evidence to prove the "distinctively marked police vehicle" element of these offenses. This claim is meritless.

a. *Legal principles.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

" 'An appellate court must accept logical inferences that the [finder of fact] might have drawn from the circumstantial evidence.' [Citation.] 'Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact].' [Citation.]" (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) As our Supreme Court said in *People v. Rodriguez, supra,* 20 Cal.4th 1, while reversing an insufficient evidence finding because the reviewing court had rejected contrary, but equally logical, inferences the jury might have drawn: "The [Court of Appeal] majority's reasoning . . . amounted to nothing more than a different weighing of the evidence, one the jury might well have considered and rejected. The Attorney General's inferences from the evidence were *no more inherently speculative* than the majority's; consequently, the majority erred in substituting its own assessment of the evidence for that of the jury." (*People v. Rodriguez, supra,* 20 Cal.4th at p. 12, italics added.)

"[Vehicle Code s]ection 2800.2 makes it a crime for a motorist to flee from, or attempt to elude, a pursuing peace officer's vehicle in 'violation of Section 2800.1' and 'in a willful or wanton disregard for the safety of persons or property.' Under section 2800.1, a person who operates a motor vehicle 'with the intent to evade, willfully flees or otherwise attempts to elude a pursuing peace officer's motor vehicle, is guilty of a misdemeanor . . . *if all of the following conditions exist*: [¶] (1) The peace officer's motor vehicle is exhibiting at least one lighted red lamp visible from the front and the person either sees or reasonably should have seen the lamp. [¶] (2) The peace officer's motor vehicle is sounding a siren as may be reasonably necessary. [¶] (3) *The peace officer's motor vehicle is distinctively marked*. [¶] (4) The peace officer's motor vehicle is operated by a peace officer . . . wearing a distinctive uniform.' (Italics added.) Thus, the statute requires four distinct elements, each of which must be present: (1) a red light, (2) a siren, (3) a distinctively marked vehicle, and (4) a peace officer in a distinctive uniform. [Citation.]" (*People v. Hudson* (2006) 38 Cal.4th 1002, 1007-1008.)

7

Similarly, Vehicle Code section 2800.4 is directed at "a person [who] willfully flees or attempts to elude a pursuing peace officer in violation of Section 2800.1, and the person operating the pursued vehicle willfully drives that vehicle on a highway in a direction opposite to that in which the traffic lawfully moves upon that highway . . . ."

b. *Discussion*.

Sanchez contends the prosecution failed to prove these two crimes because the "distinctively marked" element was missing. He notes *Hudson* holds "that a peace officer's vehicle is distinctively marked if its outward appearance during the pursuit exhibits, *in addition to* a red light and a siren, one or more features that are reasonably visible to other drivers and distinguish it from vehicles not used for law enforcement so as to give reasonable notice to the person being pursued that the pursuit is by the police." (*People v. Hudson, supra,* 38 Cal.4th at p. 1006, italics added.) "[I]n determining whether the pursuing police vehicle is distinctively marked, a jury may consider *only* the distinguishing features of the vehicle itself that are reasonably visible to other drivers and serve to distinguish the vehicle from vehicles not used in law enforcement." (*Id*. at p. 1014.)

*Hudson* approved the reasoning of both *People v. Mathews* (1998) 64 Cal.App.4th 485, 489-490 (alternating headlights satisfied "distinctively marked" element) and *People v. Estrella* (1995) 31 Cal.App.4th 716, 722-723 (light bar on windshield, rear warning lights and alternating headlights satisfied "distinctively marked" element). *Hudson* itself concluded a rear blue amber blinking light might have satisfied the "distinctively marked" element had the jury been given a proper instruction on the crime's elements. Here, Officer Fong testified his vehicle was equipped with rear emergency lights that had been

8

activated during the chase, and the trial court did not give the kind of jury instruction disapproved of by *Hudson*.[3]

In addition, when Sanchez testified, he admitted that before reaching the freeway proper he realized the police were trying to pull him over and he made a conscious decision not to stop. Given these admissions, the evidence was certainly sufficient to prove Sanchez violated Vehicle Code sections 2800.2 and 2800.4.

2. *Chavarin's sentence did not violate section 654.*

Chavarin contends the trial court should have stayed his sentence for extortion (count 9).[4] He argues the sentence constituted improper multiple punishment under section 654 because he had already been punished for the same course of conduct when the trial court sentenced him on count 6 (kidnapping for ransom). This claim is meritless.

---

[3] The trial court in *Hudson* told the jury: " 'The term "distinctively marked" does not necessarily mean that the police vehicle must be marked with an insignia or logo. The jury is to determine whether the circumstances, which may include evidence of a siren and red lamp, are sufficient to inform any reasonable person that he was being pursued by a law enforcement vehicle.' The court then incorporated that modified definition of 'distinctively marked' into the standard jury instruction defining the offense of attempting to elude a pursuing peace officer with willful disregard of the safety of persons or property. (See CALJIC No. 12.85 (1999 rev.).) Defense counsel objected to the modified part of the instruction on the ground that it left out the statutory requirement that the police vehicle be distinctively marked, but he did not offer an alternative instruction." (*People v. Hudson, supra,* 38 Cal.4th at p. 1011.) *Hudson* held the instruction was incorrect because "for purposes of section 2800.1, a pursuing peace officer's vehicle is 'distinctively marked' if its outward appearance during the pursuit exhibits, *in addition to* a red light and a siren, one or more features that are reasonably visible to other drivers and distinguish it from vehicles not used for law enforcement so as to give reasonable notice to the fleeing motorist that the pursuit is by the police." (*Id*. at pp. 1010-1011, fn. omitted.) Sanchez's jury was given only the standard instruction, which listed "distinctively marked" as a separate element *in addition to* one red lamp visible from the front of the vehicle and a siren.

[4] The trial court imposed a concurrent term on count 9.

9

a. *Legal principles.*

Section 654, subdivision (a), the prohibition against multiple punishment, provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.]" (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)

"The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination. Its findings on this question must be upheld on appeal if there is any substantial evidence to support them. [Citations.] 'We must "view the evidence in a light most favorable to the respondent and presume in support of the [sentencing] order the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]' " (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312-1313; *People v. McCoy* (1992) 9 Cal.App.4th 1578, 1585 [trial court's finding, whether explicit or implicit, may not be reversed if supported by substantial evidence].)

b. *Background.*

The trial court expressly found Chavarin had engaged in more than one course of conduct when he double-crossed his crime partners and brokered his own deal to set Olascoaga free in exchange for whatever cash Olascoaga could give him. As the trial court explained: "The demand by Sanchez for $250,000 was not bearing fruit. The threat to physically maim Mr. Olascoaga inside of the defendant's own apartment appeared to place the defendant in a precarious position. The defendant, therefore, decided to double cross Mr. Sanchez and obtain the

10

financial benefit for himself. In that regard, he cut a deal with Mr. Olascoaga for his release in exchange for $29,000. This, the court believes, is a separate intended objective. Mr. Chavarin shifted from the original plan to the new plan and that shift is a change in that intent and objective."

        c. *Discussion*.

The jurors were told the elements of kidnapping for ransom or extortion (count 6) were the following:

"1. A person was seized, confined, inveigled, enticed, decoyed, adducted, concealed, kidnapped, or carried away;

"2. The action and/or actions taken in Element 1 against the person was without that person's consent; and

"3. The perpetrator of the action and/or actions taken in Element 1 had the specific intent to hold or detain that person for ransom or to commit extortion or to obtain something of value from another."

The jurors were told the elements for extortion (count 9) were the following:

"1. A person obtained property from the alleged victim;

"2. The property was obtained with . . . the consent of the alleged victim;

"3. The alleged victim's consent was induced by the wrongful use of force or fear; and

"4. The person who wrongfully used force or fear did so with a specific intent to induce the alleged victim to consent to the giving up of his property."

Chavarin argues these instructions allowed his jury to convict him on count 6 for kidnapping Olascoaga for ransom, as well as on count 9 for extorting money from Olascoaga "based on a shared objective, or specific intention, of obtaining the victim's property (via extortion). [¶] There was substantial trial evidence to support one and only one criminal objective on the part of appellant throughout the events . . . to wit, to get as much money as possible from Olascoaga and his wife in return for Olascoaga's release." He argues: "The money demands were based on the abductors' perception that Olascoaga and his wife had substantial business and

11

real estate holdings that would permit them to meet the abductors' demands quickly. The abductors' demands started at $250,000; but after Olascoaga told them that he was in bankruptcy and no longer controlled his real estate holdings, their demand shrank to $100,000 to be paid immediately, and the balance of the $250,000 to be paid after Olascoaga's release. [¶] Put simply, the abductors' collective objective (including that of appellant) was to get as much money from Olascoaga and his wife as they could pay in exchange for his release." Chavarin asserts his "own objective remained unchanged when he offered, on his own, to release Olascoaga in exchange for Olascoaga giving" him whatever money he had.

Citing two Court of Appeal cases, the Attorney General argues the trial court properly determined the events were more correctly characterized as a divisible course of conduct involving multiple objectives.

In *People v. Porter* (1987) 194 Cal.App.3d 34, the defendant and an accomplice jumped into the victim's car, held a knife to his throat and looked through his wallet. Finding less than $10, the perpetrators insisted the victim must have more money. After discovering what they believed to be an ATM card, the perpetrators had the victim drive them to his bank. While they were waiting for their turn at the ATM machine, the victim escaped. On appeal, the defendant claimed he had been improperly sentenced for both robbery and kidnapping for the purpose of robbery.

*Porter* held there was no section 654 violation. "The record in this case supports the trial court's implied finding that the two crimes for which appellant was sentenced involved multiple objectives, were not merely incidental to each other, and were not part of an indivisible course of conduct. [¶] A reasonable inference from the record is that appellant and his companion initially planned only to rob the victim of the contents of his wallet, but thereafter came up with a new idea: kidnapping the victim to his bank to compel him to withdraw money from his account by means of what they thought was an automated teller card." (*People v. Porter, supra,* 194 Cal.App.3d at p. 38.) "This is not, therefore, a case of punishing

12

appellant for kidnapping for the purpose of robbery and for committing 'that very robbery.' [Citation.] Nor is this a case of multiple punishment for taking several items during the course of a robbery. [Citation.] *What began as an ordinary robbery turned into something new and qualitatively very different. No longer satisfied with simply taking the contents of the victim's wallet, appellant decided to forcibly compel the victim to drive numerous city blocks to a bank where, only with the victim's compelled assistance, could appellant achieve a greater reward. The trial court could reasonably treat this as a new and independent criminal objective, not merely incidental to the original objective and not a continuation of an indivisible course of conduct*. In the unusual circumstances of this case, appellant could be punished both for the robbery he committed and the kidnapping for the purpose of a distinctly different type of robbery." (*Id*. at pp. 38-39, italics added.)

In *People v. Smith* (1992) 18 Cal.App.4th 1192, Smith and his accomplice visited the victim's apartment, where Smith punched the victim in the face, pinned him to the floor and demanded money. The victim turned over several hundred dollars, but Smith demanded more. The victim said he might be able to get more at the bank. Forcing the victim into his own car, Smith drove to a bank ATM. The victim handed over his ATM card and personal identification number, which allowed Smith to withdraw $200. The perpetrators then released the victim and drove off in the victim's car. Smith was convicted of robbery, kidnapping for robbery, assault with a deadly weapon and car theft. The Court of Appeal held section 654 did not preclude separate punishment for both robbery and kidnapping for robbery. Relying on the reasoning in *Porter*, *Smith* concluded these crimes did not constitute an indivisible transaction.

The Attorney General argues "the record supports the trial court's finding that the original kidnapping and appellant's extortion had multiple divisible objectives because the extortion perpetrated solely by appellant Chavarin was qualitatively different than the original kidnapping that was carried out by appellant Sanchez, appellant Chavarin, and the others." We agree. The evidence showed

13

there had been a drastic change of plans, even more drastic than in *Porter* or *Smith*. After the initial ransom scheme seemed to be failing, and when it appeared his partners were planning to torture Olascoaga inside Chavarin's apartment, Chavarin decided on a double cross. He came up with a plan that would benefit only himself, and that could be carried out because his partners were absent at the moment. To execute this new plan, Chavarin went so far as to give Olascoaga a loaded gun in case his partners tried to intervene. By double-crossing his partners in this way, Chavarin embarked upon a new objective and, thereby, created a divisible course of conduct. Although the aim of this second criminal enterprise was also to extort money from Olascoaga, this second objective would benefit Chavarin at the expense of his partners in the first scheme.

Chavarin's reliance on *People v. Bauer* (1969) 1 Cal.3d 368, to defeat this reasoning is misplaced. *Bauer* was a home invasion case in which the defendant and his accomplice tied the victims up, ransacked their house and carried the stolen loot into the victims' garage. The perpetrators then drove the loot away in a car belonging to one of the victims. *Bauer*'s own analysis shows why that case does not apply here: "The Attorney General urges that the separate sentences for robbery and car theft may be upheld on the theory that the robbery was complete before the theft of the car began and that the theft of the automobile was an afterthought to the original transaction. The fact that one crime is technically complete before the other commenced does not permit multiple punishment where there is a course of conduct comprising an indivisible transaction. [Citations.] And the fact that one of the crimes may have been an afterthought does not permit multiple punishment where there is an indivisible transaction. . . . *Moreover, the evidence in the instant case does not show that the theft of the car was an afterthought but indicates to the contrary that the robbers, who while ransacking the house were carrying the stolen property to the garage, formed the intent to steal the car during the robbery if not before it.* (*Id.* at p. 377, italics added.)

14

The facts here are entirely different. Chavarin's unilateral change of heart and decision to free Olascoaga in exchange for whatever cash Olascoaga could immediately pay him was more than an "afterthought." It constituted an entire change of plans that was carried out in direct opposition to the interests of his former partners.

There was substantial evidence to support the trial court's sentencing determination.

3. *Remand for recalculation of presentence custody credits.*

Chavarin contends, and the Attorney General properly agrees, that we must remand for further proceedings to insure a proper calculation of presentence custody credits. It appears the credits awarded by the trial court may have failed to include time Chavarin spent in custody in Mexico after his arrest there, and before he was returned to the United States. As our Supreme Court said in *In re Watson* (1977) 19 Cal.3d 646: "The crucial element of [section 2900.5] is not where or under what conditions the defendant has been deprived of his liberty but rather whether the custody to which he has been subjected 'is attributable to charges arising from the same criminal act or acts for which the defendant has been convicted.' (§ 2900.5, subd. (b).) In recognition of this element the courts have placed the emphasis on the *fact* of the defendant's custody prior to the commencement of his sentence regardless of the particular locale, institution, facility or environment of his incarceration." (*Id.* at pp. 651-652.) "It is noteworthy that in 1976 the Legislature . . . amended section 2900.5, to broaden the term 'custody' without limitation as to place of presentence custody. It is also noteworthy that the Courts of Appeal have at least impliedly recognized that presentence custody in another jurisdiction qualifies for credit." (*Id.* at pp. 652-653, fn. omitted.)

We will remand Chavarin's case so the trial court may determine if he is entitled to additional presentence custody credits.

15

## DISPOSITION

The judgments are affirmed. Chavarin's case is remanded to the trial court for further proceedings in conformance with this opinion.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:


KITCHING, J.


ALDRICH, J.

16