Filed 11/27/24  P. v. Morello CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICHARD VINCENT MORELLO,<br><br>    Defendant and Appellant. | A168127<br><br>(Contra Costa County<br>Super. Ct. No. 01001981174) |

Defendant Richard Vincent Morello appeals his conviction after a jury found him guilty of fleeing from a pursuing peace officer's vehicle while driving recklessly.  (Veh. Code, § 2800.2.)[1]  Morello argues (1) there was no substantial evidence he was being pursued by a "distinctively marked" law enforcement vehicle as required by section 2800.1, which requirements are incorporated into section 2800.2, and (2) the trial court prejudicially erred by admitting evidence of a prior uncharged incident (an instance of Morello fleeing a pursuing California Highway Patrol vehicle, three months before this offense).  We disagree and affirm.

---

[1] Undesignated statutory references are to the Vehicle Code.

1

# I. BACKGROUND

In March 2022, the Contra Costa County District Attorney's office filed a single count information charging Morello with violating section 2800.2, and for violating his probation by commission of that offense. (Pen. Code, § 1203.3).

## A. *Officer Walker's Testimony*

At the ensuing trial, Officer Daniel Walker of the Concord Police Department testified that on February 3, 2022, he and his partner were on patrol in Concord, California as part of the "Special Enforcement Team." The team was "a proactive unit that goes out and addresses various problems in the community," such as "neighborhood issues." Walker was wearing a black police uniform, displayed a cloth patch star and his name, and wore "full uniform gear," which included a radio, duty belt, firearm, taser, and baton.

Walker and his partner were patrolling in an unmarked patrol vehicle that, according to Walker, enabled the team to "proactively enforce the high crime areas with less of a signature. But . . . it's not very sneaky." Such cars were "basically a cop car without the overhead light bars. That is, the overhead light bars are placed inside . . . the front windshield. [¶] And instead of a big white door with a star on it, it's painted black. But it still has a push bumper, spotlights, siren . . . [and] the forward-facing light bar with red light and blue lights. And big ol' radio antennas off the back." It also had a "California exempt" license plate.

Walker further testified that the patrol vehicle's push bumper was "wraparound-style" and had "a little push bar" on its front "to help move traffic off the road." The push bar displayed an alternating red and blue LED light when activated. The forward-facing light bar was "mounted on the windshield kind of where the window lights would be on but facing forward."

The vehicle also had headlights that became alternating, flashing white lights, called "wigwag" lights, when activated and a forward-facing spotlight on the driver's side view mirror which was used to illuminate vehicles at night and the interior of vehicles during traffic enforcement stops. At the beginning of his patrol that night, Walker checked the patrol vehicle's functions and everything was working properly.

Walker acknowledged a number of the vehicle's features could be found in non-law-enforcement vehicles. For example, tow trucks and construction vehicles might have push bumpers, and non-law-enforcement vehicles could have California exempt license plates, radio antennas, sirens, or lights, though, he said, not solid, forward-facing red lights.

At approximately 12:14 a.m. that night, Walker observed a silver 2004 Dodge truck fail to stop for a stop sign, proceed through the intersection "at a considerable rate of speed," and "swerve[] towards the right shoulder." Also, it was missing a white light over the rear license plate, a Vehicle Code violation. Thinking the truck was being driven recklessly, the officers attempted a traffic enforcement stop. They accelerated their vehicle to near the truck, which turned into a gas station parking lot.

In the parking lot, the truck stopped facing a business. The officers stopped their vehicle about 15 feet away from, and "catty-corner" to, the truck. The officers could not completely box it in because of the gas station's configuration. They activated the patrol vehicle's emergency lights, which included the patrol vehicle's forward-facing red light and red and blue LED lights that alternate or flicker. Walker also activated the vehicle's spotlight during this stop (though he does not recall if he used it after that).

Walker exited the patrol vehicle and stood near its driver's door. He believed the truck's driver saw him because, he testified, at some point the

3

driver "looked over his right shoulder towards me in my patrol vehicle and then began backing his truck up out of the parking spot." The driver came within a couple of feet of the patrol vehicle as he maneuvered around it, driving at a "pretty slow speed around us." He then "turned and fled" out of the gas station, though not at a high speed.

Walker activated the patrol vehicle's emergency lights and siren as the officers followed the truck. They followed the truck through the streets in light traffic for about six minutes over a distance of 4.2 miles.[2] The patrol vehicle's dash camera normally activated when the emergency lights were activated but there was no dash camera footage recorded of the pursuit.

During this pursuit, Walker observed the truck move evasively and repeatedly exceed the speed limit, including, at Walker's estimate using the "pacing" method (in which he kept a steady distance behind a vehicle to estimate the vehicle's speed), going 40 miles an hour in a 25 or 30 mile an hour area and 45 miles an hour in a 35 mile an hour area. The truck also failed to stop or stop completely for a total of seven stop signs and red lights, including entering an intersection despite a red traffic signal at 25 miles an hour. Walker did not see any other traffic going in the direction of their pursuit path.

The truck drove on a direct path to Morello's residential neighborhood and yielded to the law enforcement stop by stopping in the middle of the road two to three houses from his residence. The officers drew their firearms and ordered the driver out of the vehicle. The driver, who Walker identified as

---

[2] The prosecution introduced Google map photographs that depicted the general area of the pursuit path.

4

Morello, did not resist and was taken into custody. There was a warrant out for his arrest. He was arrested both because of the outstanding warrant and because of his commission of a section 2800.2 violation while fleeing, among other Vehicle Code offenses.

The prosecution introduced into evidence body camera footage of the stop by Morello's residence that included views of the truck and the patrol vehicle. When shown the footage, Walker indicated he saw the patrol vehicle's forward-facing light bar in the windshield with its alternating red and blue lights, the "wigwag" alternating white headlights, and an alternating red and blue LED light on the push bar on the front of the vehicle's wraparound bumper. He said the lights as seen in the camera footage were "exactly how" they were displayed during the pursuit.

## B. *Officer Garcia's Testimony*

The prosecution also presented the testimony of Officer Adan Garcia of the California Highway Patrol regarding an earlier police pursuit of Morello when he was driving the same truck. This incident occurred about three months before the charged offense at around 10:20 a.m. on November 5, 2021.

Garcia testified he was driving a black and white patrol vehicle, a Dodge Charger, northbound on Interstate 680 when he saw the truck ahead of him traveling, according to the radar unit in Garcia's patrol vehicle, at 90 miles an hour. Garcia initiated an enforcement stop, getting behind the truck and activating his forward-facing red lights.

The truck started to take an off-ramp but then veered back on the freeway and fled from the patrol vehicle. It exited the freeway and sped through the streets for about four miles over a period of two to three minutes. It passed an elementary or middle school, during which time Garcia discontinued his pursuit to avoid the risk a chase would pose to the children at the school.

Garcia saw the truck enter a residential area. He followed, not in pursuit but with his lights "active." At that point, he was able to see the driver, whom he identified as Morello. Garcia, after losing sight of the truck for about ten minutes at one point, arrested Morello for violating section 2800.1, the arrest occurring on the street where, according to Walker, Morello's residence was located.

## C. *Verdict, Sentence, and Appeal*

The jury found Morello guilty as charged. On the same date, the trial court found, based on the evidence presented at trial, that Morello had violated his probation on February 3, 2022, in a separate misdemeanor case.

The trial court suspended imposition of sentence and placed Morello on two years' formal probation, ordered him to serve 270 days in jail, and granted him 176 days credit. The court waived or stayed fines and fees based on its finding that Morello did not have the ability to pay them. It reinstated and terminated probation in another case.

Morello filed a timely notice of appeal.

## II. DISCUSSION

### A. *Morello's Contention That the Patrol Vehicle Pursuing Him Was Not Distinctively Marked as a Police Vehicle*

Morello first argues we must reverse the judgment because there is not substantial evidence that Walker's patrol vehicle was "distinctively marked" as a police vehicle. We disagree. A police vehicle is "distinctively marked" so long as it has a red light and siren—which the vehicle at issue indisputably had—along with any number of other characteristics that, from the perspective of a reasonable person, distinguish it from vehicles not used in law enforcement. For a pursuing vehicle to qualify for a section 2800.2 offense (with section 2800.2's incorporation of section 2800.1's requirements,

6

as we will discuss), there is no single set of distinguishing colors, configurations, or markers.

"‘"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Dalton* (2019) 7 Cal.5th 166, 243–244.) " 'A reviewing court neither reweighs [the] evidence nor reevaluates a witness's credibility.' [Citation.] Reversal is not warranted 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction.]" ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 378.)

"Section 2800.2 makes it a crime for a motorist to flee from, or attempt to elude, a pursuing peace officer's vehicle in 'violation of Section 2800.1' and 'in a willful or wanton disregard for the safety of persons or property.' Under section 2800.1, a person who operates a motor vehicle 'with the intent to evade, willfully flees or otherwise attempts to elude a pursuing peace officer's motor vehicle, is guilty of a misdemeanor . . . if all of the following conditions exist: [¶] (1) The peace officer's motor vehicle is exhibiting at least one lighted red lamp visible from the front and the person either sees or reasonably should have seen the lamp. [¶] (2) The peace officer's motor vehicle is sounding a siren as may be reasonably necessary. [¶] (3) The peace

7

officer's motor vehicle is distinctively marked. [¶] (4) The peace officer's motor vehicle is operated by a peace officer . . . wearing a distinctive uniform.' . . . Thus, the statute requires four distinct elements, each of which must be present: (1) a red light, (2) a siren, (3) a distinctively marked vehicle, and (4) a peace officer in a distinctive uniform." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1007–1008, italics omitted (*Hudson*).)

"[F]or purposes of section 2800.1, a pursuing peace officer's vehicle is 'distinctively marked' if its outward appearance during the pursuit exhibits, *in addition* to a red light and a siren, one or more features that are reasonably visible to other drivers and distinguish it from vehicles not used for law enforcement so as to give reasonable notice to the fleeing motorist that the pursuit is by the police." (*Hudson*, *supra*, 38 Cal.4th at pp. 1010–1011, fn. omitted.) In other words, "[t]o be distinctively marked, a vehicle must have, in addition to a red light and siren, one or more distinguishing physical features that are reasonably visible to other drivers during the pursuit." (*Id*. at p. 1013.) A defendant's actual awareness is not relevant to whether substantial evidence shows a police vehicle was distinctively marked. (See *id*. at pp. 1009–1010 [section 2800.1 "cannot be construed as encompassing consideration of circumstances that have no relationship whatsoever to the vehicle's appearance"].)

While the distinctive marking required under section 2800.1 needs to be something more than a red light and siren, it does not need to be much more. For example, in *Hudson*, our high court rejected an insufficient evidence argument by concluding that a jury "could reasonably have found that the car's 'blue amber blinking lights' were reasonably visible to other drivers and distinguished the car from vehicles not used for law enforcement,

8

and thus that the car was distinctively marked." (*Hudson*, *supra*, 38 Cal.4th at p. 1014.)

Appellate courts in two cases approvingly discussed in *Hudson*, *People v. Estrella* (1995) 31 Cal.App.4th 716 and *People v. Mathews* (1998) 64 Cal.App.4th 485, similarly concluded the evidence required to prove a vehicle is "distinctively marked" under section 2800.1 need not include police logos or be a great deal more than a red light and a siren. (*Hudson*, *supra*, 38 Cal.4th at p. 1008.) The *Estrella* court considered an afternoon pursuit by a police officer driving an unmarked white Chevrolet Caprice of a car reaching speeds of 50 miles an hour on local streets and passing through multiple stop signs. (*Estrella*, at pp. 718–720.) According to the testifying police officer, the Caprice, observed from the front with the lights off, could not be "identified . . . as a police vehicle unless [a] person paid close enough attention to notice the light bar inside." (*Estrella*, at p. 720.) It had a light bar with red and blue lights, two of which flashed, inside the front windshield on the passenger side and "wigwag" alternating headlights, all of which were activated during the pursuit. (*Estrella*, at pp. 719–720.)[3] The court concluded, "We find it incredible to believe or even seriously argue that a reasonable person, upon seeing a vehicle in pursuit with flashing red and blue lights, wigwag headlights and hearing a siren, would have any doubt that said pursuit vehicle was a police vehicle." (*Estrella*, at p. 723.)

*Mathews* involved an afternoon pursuit of a speeding vehicle through local streets by a police officer in "an unmarked police vehicle equipped with a siren, a red light mounted on the front dashboard, and headlights which

---

[3] The court also indicated the Caprice had spotlights, but did not indicate they were activated during the pursuit. (*Estrella*, *supra*, 31 Cal.App.4th at p. 720.)

9

flashed in an alternating, 'wigwag' pattern." (*Mathews*, *supra*, 64 Cal.App.4th at p. 487.)  The defendant argued there was insufficient evidence that the police vehicle was "sufficiently marked" because it had fewer distinctive marks than the vehicle discussed in *Estrella*.  (*Id*. at p. 488.) The appellate court rejected this argument, concluding that "red lights, siren, and wigwag headlights were sufficiently distinctive markings to inform any reasonable person he was being pursued by a law enforcement vehicle."  (*Id*. at p. 490.)

*Hudson*, *Estrella*, and *Mathews* strongly support the conclusion that the jury's finding that Morello fled from a "distinctively marked" police vehicle rests on substantial evidence.  Walker testified that when he approached Morello's car in the gas station parking lot with his patrol vehicle, he not only activated his vehicle's red light but also its forward-facing flickering red and blue LED lights and a spotlight on the driver's side view mirror.  Also, the patrol vehicle had a wraparound bumper with a push bar in its front, large radio antennas and a California exempt license plate, indicating it was something more than a civilian vehicle, and all of which the jury could reasonably conclude were visible to Morello, particularly because, according to Walker, he drove his truck within two feet of the patrol vehicle when he backed his truck out and past it.

This, however, was just the beginning.  Once the truck left the parking lot, Walker and his partner engaged in a full-blown pursuit of it.  During this pursuit, Walker activated not only the patrol vehicle's red light and flashing red and blue LED lights, but also its "wigwag" alternating white headlights (found to be a major distinctive marking in both *Estrella* and *Mathews*), the alternating red and blue light on the wraparound bumper's front push bar, and the vehicle's siren.  And this pursuit was far from momentary; rather, it

10

lasted about six minutes, more than enough time for any motorist to notice these multiple flashing lights. Like the court in *Estrella*, we find it incredible to believe or even seriously argue that a reasonable person, upon seeing a vehicle in pursuit with a red light and flashing red and blue lights in the windshield, an alternating red and blue light on the front of the vehicle's wraparound bumper, and wigwag headlights, and upon hearing a siren, would have any doubt that it was a police vehicle.

Morello's arguments to the contrary are utterly unpersuasive. He notes that it was dark and that the patrol vehicle was intended to go unnoticed in high crime areas. This ignores that a reasonable juror could conclude Morello saw the vehicle's features given how close he came to it at one point, and the obvious fact that the vehicle's multiple lights when activated were visible in the darkness. Morello also cites Walker's testimony that a number of the patrol vehicle's features are not particular to police vehicles, such as wraparound bumpers that can also be found on tow trucks. This, however, does not take into account that the patrol vehicle had *all* of these features, including a flickering red and blue light that Walker testified was particular to police vehicles. And our Supreme Court in *Hudson* and appellate courts in *Estrella*, and *Mathews* have held that a jury could reasonably conclude that unmarked pursuing vehicles exhibiting less features are distinctively marked as police vehicles.

In short, considering the evidence in the light most favorable to the judgment, including the reasonable inferences to be drawn from such evidence, we conclude there is substantial evidence justifying the jury's finding that Morello fled from a distinctively marked police vehicle. Morello's arguments to the contrary lack merit.

### B. *Morello's Contention That the Trial Court Prejudicially Erred by Admitting the Evidence of the November 2021 Incident*

Next, Morello argues we must reverse the judgment because the trial court prejudicially erred by admitting evidence of Morello's November 2021 flight from a Highway Patrol vehicle. Here, he relies on claimed violations of Evidence Code section 1101, subdivision (b), Evidence Code section 352, and the due process guarantees of the state and federal constitutions. We reject all of these arguments. Even assuming the claimed errors occurred, we see no prejudice.

#### 1. Relevant Proceedings Below

Before the trial, the prosecution sought to admit pursuant to Evidence Code section 1101, subdivision (b), evidence that Morello was arrested for fleeing in his truck from an officer's police vehicle about three months before the charged offense, on November 5, 2021. The prosecutor argued the evidence was relevant to prove a variety of things, including intent, knowledge, and lack of mistake, and should be admitted because it too involved Morello speeding in his truck and failing to stop for officers driving in pursuit of him until he reached the neighborhood where he lived.

The defense objected to the admission of the evidence, including on the ground that Morello's prior uncharged conduct was dissimilar in several particulars to the charged offense, and because the evidence was not admissible under Evidence Code section 352.

The trial court admitted the evidence because it found it "more probative than prejudicial" as to intent, motive, and knowledge or lack of mistake. It instructed the jury with a modified version of CALCRIM No. 375 that its consideration of this evidence was limited consistent with the court's ruling.

12

In closing argument, the prosecutor repeatedly urged the jury to consider Morello's prior fleeing from a police vehicle in finding he likely intended to evade arrest in the present instance. The defense argued the prosecution failed to prove Morello intended to evade the police or drove recklessly, emphasizing, for example, that he did not try to get on a freeway or drive at high speeds. It asked the jury to disregard the November 2021 incident because it was dissimilar to the instant offense in certain material respects. The defense also questioned Walker's recollection of the February 2022 pursuit, particularly in light of the fact that there was no dash camera footage of the pursuit despite his testimony that activating the patrol vehicle's emergency lights should have activated the camera.

### 2. Analysis

Morello's claims of prior uncharged conduct evidentiary error are unpersuasive for multiple reasons. The most obvious is that, assuming for the sake of argument that the trial court erred in admitting evidence of the November 2021 incident, it is apparent that such an error was harmless, whether we evaluate for prejudice under our state standard (*People v. Watson* (1956) 46 Cal.2d 818, 836) for such errors or the federal standard (*Chapman v. California* (1967) 386 U.S. 18, 24) used for constitutional due process violations. In contending to the contrary, Morello relies on his claim that there was no substantial evidence that Walker's vehicle was distinctively marked as a police vehicle. We cannot agree, as we view the lack-of-distinctive-marking issue as weak on this record.

Based on the post-gas station pursuit, Morello emphasizes that the jury could well have decided from Walker's testimony that the dash camera should have been activated by Walker's use of his emergency lights. On this premise, Morello contends that the lack of such footage suggests Walker did

13

not in fact activate the lights, which would have made his vehicle less distinctive. This contention is unpersuasive for multiple reasons.

First, it ignores Walker's testimony that he activated his emergency lights in the gas station and directed a spotlight in Morello's direction, neither of which Morello questions. Second, regardless, Walker testified that as Morello backed his truck out of where he had stopped in the gas station, he came within two feet of the patrol vehicle, from which it can safely be concluded that he was able to readily observe the features we have discussed that distinctively marked the vehicle as a police vehicle. Third, there was camera footage of the stop by Morello's residence that, according to Walker's testimony, plainly showed the various lights on the vehicle that were activated, which Walker testified was exactly as they were activated during the pursuit. Finally, common sense dictates that officers in pursuit of a vehicle for six minutes would likely attempt to use the lights available to them to gain the vehicle driver's attention.

Morello also emphasizes what he suggests was his careful driving that night, apparently to further contend that he did not know he was fleeing from a police vehicle or driving recklessly. He points out that he passed two freeway entrances without getting on the freeway, drove at relatively low speeds, slowed down at every intersection, which offered a clear view of oncoming traffic upon his approach, took a direct path his residence, and cooperated with police when he was arrested there.

Morello overstates his case—he repeatedly exceeded the speed limit of the streets upon which he fled, drove through *seven* stop signs or traffic signals, entering one intersection at 25 miles an hour, and evaded police despite their obvious pursuit for a lengthy period of time, six minutes. This

14

evidence overwhelmingly supports his conviction before we even consider the November 2021 incident.

In short, while we can see why Morello saw fit to raise the vehicle marking issue—on the surface, this issue arguably has some plausibility—the arguments marshaled in support of it fail in the face overwhelming record evidence to the contrary. Looking at the record as a whole, and crediting the evidence favoring the prosecution, as we must, we conclude no serious contention can be made that a reasonable person, upon seeing a pursuing vehicle with the features of Walker's patrol vehicle and with its lights activated as described by Walker, would have had any doubt that they were being pursued by a police vehicle. Accordingly, we need not discuss the merits of Morello's prior uncharged conduct arguments. Put simply, his claim of *reversible* error lacks merit because any such error was harmless beyond a reasonable doubt.

### III. DISPOSITION

The judgment is affirmed.

STREETER, J.

WE CONCUR:

BROWN, P. J.
GOLDMAN, J.

15