IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: March 29, 2018_____

**NO. A-1-CA-35275**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**ROY MONTANO,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Fred T. Van Soelen, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
John J. Woykovsky, Assistant Attorney General
Albuquerque, NM

for Appellee

Attorney & Counselor at Law, P.A.
Eric D. Dixon
Portales, NM

for Appellant

**OPINION**

**BOHNHOFF, Judge.**

{1}    Roy Montano (Defendant) was convicted of aggravated fleeing from a law enforcement officer in violation of NMSA 1978, Section 30-22-1.1(A) (2003). Defendant contends on appeal, as he argued below, that the Curry County Sheriff's Office deputy whose signals to stop Defendant refused to obey was neither "uniformed" nor in "an appropriately marked law enforcement vehicle" as required by the statute. *See id.* We conclude that, while the deputy's vehicle complied with the statutory requirement, the clothes that he was wearing did not constitute a uniform. We therefore reverse Defendant's conviction.

**BACKGROUND**

{2}    On September 4, 2013, Deputy Glenn Russ with the Curry County Sheriff's Office was working as an "investigator." He was wearing the clothes that investigators were required to wear: "a dress shirt with tie, dress slacks, and dress shoes." His badge was displayed on the breast pocket of his shirt. He was driving a Ford Expedition that had no decals, striping, insignia, or lettering on the front, back, or sides of the vehicle. However, the vehicle had a government license plate, wigwag headlights, red and blue flashing lights mounted on the front grill and the top of the rear window, flashing brake lights, and a siren.

{3} Around noon that day, while Deputy Russ was driving within the Clovis, New Mexico city limits, he observed Defendant enter a vehicle and begin driving. Russ initially thought Defendant was someone else whom Russ believed had an outstanding warrant. Russ approached Defendant's vehicle from behind and checked the license plate. Russ determined that the vehicle was registered to Defendant, not the other person, but that the registration for Defendant's vehicle had expired. At that point Russ attempted to stop Defendant for the registration infraction by "utilizing the [red and blue flashing] lights" on his vehicle. Defendant then made a few turns and ran a stop sign, at which point Russ activated his vehicle's siren. Defendant continued driving through a residential neighborhood at speeds that exceeded the posted speed limits and failed to stop at additional stop signs and intersections. Defendant came to a stop after his vehicle jumped a curb and drove onto an adjacent easement after he attempted to turn by braking and sliding through an intersection. Russ then approached the vehicle, removed Defendant, placed him on the ground, and handcuffed him. The pursuit lasted "a couple of minutes" in total. Undersheriff Michael Reeves, also of the Curry County Sheriff's Office, arrived at the scene after Defendant was already in custody.

{4} Defendant was charged with aggravated fleeing, contrary to Section 30-22-1.1(A). Deputy Russ and Undersheriff Reeves both testified at Defendant's bench

2

trial. During the trial, the district court took judicial notice that the vehicle Russ drove "was not a marked vehicle." The court denied Defendant's motion for directed verdict based on his uniform and "appropriately marked vehicle" arguments. The court determined that displaying a badge was enough to be in uniform; the vehicle was appropriately marked because motorists know they have to pull over and stop when they see emergency lights flash. The court found Defendant guilty of aggravated fleeing and imposed the maximum sentence of eighteen months imprisonment.

**DISCUSSION**

{5}     In 2003, the Legislature enacted the Law Enforcement Safe Pursuit Act (LESPA), 2003 N.M. Laws, ch. 260, §§ 1-4. LESPA, which is codified at NMSA 1978, Sections 29-20-1 to -4 (2003), mandates the development and implementation of law enforcement agency policies and training to reduce the risk that uninvolved motorists and bystanders will be killed or injured by vehicles involved in high-speed pursuits conducted by law enforcement personnel. However, along with LESPA's establishment of standards for the conduct of high-speed pursuits, Section 5(A) of 2003 N.M. Laws, ch. 260, codified at Section 30-22-1.1(A), established the crime of aggravated fleeing from a law enforcement officer:

> Aggravated fleeing [from] a law enforcement officer consists of a person willfully and carelessly driving his vehicle in a manner that endangers the life of another person after being given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or

other signal, by a uniformed law enforcement officer in an appropriately marked law enforcement vehicle in pursuit in accordance with the provisions of the [LESPA].

Section 30-22-1.1(B) provides that aggravated fleeing is a fourth degree felony.

{6} Section 30-22-1.1(A) presumably is patterned after NMSA 1978, Section 30-22-1(C) (1981) . Section 30-22-1, which was first enacted in 1963, established the misdemeanor crime of resisting, evading, or obstructing an officer. As amended, *see* 1981 N.M. Laws, ch. 248, § 1(C), the crime is committed by, among other actions, "willfully refusing to bring a vehicle to a stop when given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed officer in an appropriately marked police vehicle[.]" Section 30-22-1(C).

{7} Section 30-22-1(C) in turn appears to be patterned after a provision, Section 11-911(a), of the Uniform Vehicle Code that was added in 1968:

Any driver of a motor vehicle who willfully fails or refuses to bring his or her vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police vehicle when given a visual or audible signal to bring the vehicle to a stop, shall be guilty of a misdemeanor. The signal given by the police officer may be by hand, voice, emergency light or siren. The officer giving such signal shall be in uniform, prominently displaying the officer's badge of office, and the officer's vehicle shall be appropriately marked showing it to be an official police vehicle.

Nat'l Comm. on Unif. Traffic Laws & Ordinances, *Uniform Vehicle Code & Model Traffic Ordinance* § 11-911(a) (2000). A number of states have laws similar to

4

Section 30-22-1(C) and Section 30-22-1.1(A), *see, e.g.*, Ga. Code Ann. § 40-6-395(a) (2012); N.D. Cent. Code § 39-10-71 (2011), although we are aware of none with identical language.

## I. UNIFORMED LAW ENFORCEMENT OFFICER

{8} We first address whether Deputy Russ was "uniformed", i.e., wearing a uniform on September 4, 2013, within the meaning of Section 30-22-1.1(A). Defendant generally argues that the street clothes Russ was wearing that day do not constitute a uniform. The State maintains that Russ's badge alone was a uniform. Alternatively, the State argues, because he was required to wear dress shoes, pants, and shirt with tie, those items combined with his badge, handcuffs, and firearm together constituted a uniform.

{9} "When an appeal presents an issue of statutory construction, our review is de novo." *State v. Tafoya*, 2010-NMSC-019, ¶ 9, 148 N.M. 391, 237 P.3d 693. Challenges to the sufficiency of the evidence supporting a conviction that raise an issue of statutory interpretation are subject to the same de novo review standard. *See State v. Erwin*, 2016-NMCA-032, ¶ 5, 367 P.3d 905, *cert. denied*, 2016-NMCERT-___ (No. S-1-SC-35753, Mar. 8, 2016).

### A. The Plain Meaning of "Uniform"

{10} Section 30-22-1.1(A) does not define "uniformed." Therefore, we interpret its

meaning based on rules of statutory construction. "Our primary goal when interpreting statutory language is to give effect to the intent of the [L]egislature." *State v. Torres*, 2006-NMCA-106, ¶ 8, 140 N.M. 230, 141 P.3d 1284. A court begins the search for legislative intent of a statute "by looking first to the words chosen by the Legislature and the plain meaning of the Legislature's language." *State v. Davis*, 2003-NMSC-022, ¶ 6, 134 N.M. 172, 74 P.3d 1064 (internal quotation marks and citation omitted).

{11} *Webster's Third New International Dictionary* 2498 (Unabridged ed. 1986) defines "uniform" as "*dress* of a *distinctive* design or fashion adopted by or prescribed for members of a particular group . . . and serving as a means of identification[.]" (Emphases added.); *accord Uniform*, *New Oxford American Dictionary* 1890 (3d ed. 2010) (defining a uniform as "the distinctive clothing worn by members of the same organization or body"). "Dress," in turn, is defined as "utilitarian or ornamental covering for the human body: as . . . clothing *and* accessories suitable to a specific purpose or occasion[.]" *Dress*, *Webster's Third New Int'l Dictionary* 689 (Unabridged ed. 1986) (emphasis added).

{12} This definition of uniform is significant in two respects. First, a uniform consists of clothing, as distinguished from, for example, only a law enforcement officer's badge. Stated another way, equipment alone, without distinctive clothing,

6

is not "dress of a distinctive design or fashion[,]" i.e., it is not a uniform. *Cf.* 2.110.3.8(B)(2) NMAC (distinguishing between "holsters, . . . uniforms, belts, badges and related apparatus" as items eligible for purchase with funds from the Law Enforcement Protection Fund Act, NMSA 1978, §§ 29-13-1 to -9 (1993, as amended through 2017)). Second, a uniform is clothing that distinguishes the wearer from the general public, i.e., identifies him or her as a member of a particular group.

{13}     Deputy Russ's clothing was not of a distinctive design or fashion and did not serve to identify him as a law enforcement officer. On the contrary, the purpose of his outfit was, if anything, to allow him to blend in with the general public. For purposes of applying the plain meaning of uniform, it matters not that as an investigator Russ was required to wear civilian clothes: they did not distinguish him from the general public any more than the dress clothing that lawyers generally must wear in court constitutes a uniform that distinguishes them from persons who work in other occupations where dress clothes are the norm. Further, Russ's badge was not an article of clothing, even though it, too, may be a separate indicia of law enforcement officer status. Similarly, handcuffs and a holstered firearm may identify the person wearing them as a law enforcement officer, but they do not amount to clothing. Thus, absent some basis for not applying the plain meaning rule, which we now consider, Deputy Russ was not "uniformed" as that term is used in Section 30-22-1.1(A).

7

## B.    Other Statutes

{14}    In addition to looking to its plain meaning, in construing a statute, a court will consider related statutes. Statutory language "may not be considered in a vacuum, but must be considered in reference to the statute as a whole and in reference to statutes dealing with the same general subject matter." *State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939 (internal quotation marks and citation omitted). "[W]henever possible, [the appellate courts] must read different legislative enactments as harmonious instead of as contradicting one another." *Id.* (omission, internal quotation marks, and citation omitted). In addition to looking at the statutory language, "we also consider the history and background of the statute [and w]e examine the overall structure of the statute and its function in the comprehensive legislative scheme." *State v. Smith*, 2004-NMSC-032, ¶ 10, 136 N.M. 372, 98 P.3d 1022 (internal quotation marks and citations omitted).

{15}    We discern no inconsistency between Section 30-22-1.1(A), construed in accordance with the plain meaning of "uniform," and Section 30-22-1(C) quoted above, as well as several other New Mexico statutes that address law enforcement officers' uniforms and authority to stop motorists. On the contrary, these statutes are harmonious.

{16}    First, NMSA 1978, Section 29-2-13 (1989), and NMSA 1978, Section 29-2-14

8

(2015), address the uniforms and badges of the New Mexico State Police. Section 29-2-13 provides that "[a] suitable and distinctive uniform shall be prescribed by the secretary [of public safety]. The secretary shall provide and issue to each commissioned officer a uniform *and* an appropriate badge. . . . The prescribed uniform *and* badge shall be worn at all times when on duty[.]" (Emphases added.) Section 29-2-14(A), (C) create the petty misdemeanor crime of unauthorized wearing of a State Police uniform or badge. It consists of "wearing or requiring the wearing, without authorization by the secretary, of a uniform *or* badge *or both* whose material, color or design, or any combination of them, is such that the wearer appears to be a member of the New Mexico [S]tate [P]olice." Section 29-2-14(A) (emphases added). These statutes distinguish between a uniform and a badge. They can be understood to reflect the Legislature's understanding that, while a uniform and a badge are both indicia of law enforcement officer status, the two are different—i.e., a badge is not simply a part of a uniform. Uniform Vehicle Code Section 11-911 also distinguishes between a police officer's uniform and badge, requiring that the officer be in uniform as well as that the badge be "prominently" displayed.

{17}     Second, the statutory history of NMSA 1978, Section 66-8-124(A) (2007), is consistent with this distinction between a uniform and a badge. The statute currently reads,

9

No person shall be arrested for violating the Motor Vehicle Code [NMSA 1978, Section 66-1-1 to -8-141 (1978, as amended through 2017)] or other law relating to motor vehicles punishable as a misdemeanor except by a commissioned, salaried peace officer who, at the time of arrest, is wearing a uniform clearly indicating the peace officer's official status.

When enacted in 1961, Section 66-8-124(A) contained the following second sentence: "In the Motor Vehicle Code, 'uniform' means an official badge prominently displayed, accompanied by a commission of office." NMSA 1953, § 64-22-8.1 (1961). However, in 1968 the Legislature deleted the second sentence from the statute. *Compare* 1961 N.M. Laws, ch. 213, § 3, *with* 1968 N.M. Laws, ch. 62, § 162. The most logical inference to be drawn from the 1968 amendment is that which is consistent with the Legislature's enactment of Section 29-2-14(A) three years later: the Legislature determined that a badge should not be considered part of a uniform and instead is a separate indicia of law enforcement officer status.

{18}    Third, Section 66-8-125(C) parallels the current language of Section 66-8-124(A):

Members of the New Mexico [S]tate [P]olice, sheriffs, and their salaried deputies and members of any municipal police force may not make arrest for traffic violations if not in uniform; however, nothing in this section shall be construed to prohibit the arrest, without warrant, by a peace officer of any person when probable cause exists to believe that a felony crime has been committed or in nontraffic cases.

{19}    Fourth, Section 66-7-332(A), originally enacted in 1978, provides that:

10

> Upon the immediate approach of an authorized [by the state police or a local law enforcement agency] emergency vehicle displaying flashing emergency lights or when the driver is giving audible signal by siren the driver of every other vehicle shall yield the right of way and shall immediately drive to a position parallel to, and as close as possible to, the right-hand edge or curb of the roadway clear of any intersection *and shall stop and remain in that position until the authorized emergency vehicle has passed, except when otherwise directed by a police officer*.

(Emphasis added.) This statute therefore mandates, independent of Section 30-22-1(C) and Section 30-22-1.1(A), that drivers pull off the road and stop when they see or hear a law enforcement or other authorized vehicle with its emergency lights and/or siren engaged. Section 66-8-116 imposes a fifty-dollar penalty for violating Section 66-7-332.

{20} Section 66-7-332 together with Section 66-8-116, Section 30-22-1(C), and Section 30-22-1.1(A) can be viewed as evincing a common general legislative intent: enforcing, by means of progressively greater sanctions for disobedience, the public policy imperative that a motorist must promptly pull off to the side of the road and stop when he or she notices a law enforcement vehicle that has its emergency lights and/or sound equipment engaged. Section 66-8-116 sanctions a motorist with a fine for failure to comply with Section 66-8-332's general requirement to take that action in those circumstances. Section 30-22-1(C) sanctions as a misdemeanor the willful failure to stop where it is objectively clear (based on visual and audible signals, a uniform, and appropriate markings on a vehicle) that it is a law enforcement officer

11

who is signaling the motorist to stop. *See State v. Padilla*, 2008-NMSC-006, ¶ 22, 143 N.M. 310, 176 P.3d 299 (explaining that the intent of Section 30-22-1.1(A)'s uniform and appropriately marked law enforcement vehicle requirements is to "establish[] a defendant's knowledge that he is fleeing a police officer"). And in order to advance LESPA's apparent goal of reducing the risk of injuries and fatalities resulting from high-speed police chases, Sections 30-22-1.1(B) sanctions as a fourth degree felony the same failure to stop under circumstances that endanger the life of another person.

**C.      *Archuleta* and *Maes***

{21}      The State argues that *State v. Archuleta*, 1994-NMCA-072, 118 N.M. 160, 879 P.2d 792, and *State v. Maes*, 2011-NMCA-064, 149 N.M. 736, 255 P.3d 314, hold that a badge without more suffices as a "uniform" as that term is used in Sections 66-8-124(A) and Section 66-8-125(C). It urges that we extend that precedent to Section 30-22-1.1(A). We are not persuaded.

{22}      Initially, we observe that the defendants in *Archuleta* and *Maes* were not arrested and prosecuted for violating Section 30-22-1.1(A) or even Section 30-22-1(C). In *Archuleta*, the defendant was stopped for speeding. 1994-NMCA-072, ¶ 2. The question whether the arresting police officer was wearing a uniform arose only because, as discussed above, Section 66-8-124(A) and Section 66-8-125(C) require

an arresting officer to be in uniform to make an arrest for a traffic offense. *Archuleta*, 1994-NMCA-072, ¶ 7. Similarly, in *Maes*, the defendant initially was stopped on the basis of traffic infractions but following a search of his vehicle ultimately was charged with drug offenses. 2011-NMCA-064, ¶ 3. He challenged the legality of the search based on the claimed impropriety of the stop under Section 66-8-124(A) and Section 66-8-125(C). *Maes*, 2011-NMCA-064, ¶ 4.

{23} We note also that the facts of *Archuleta* and *Maes*, and as a result the questions to be resolved, were different than those of the case at bar. In *Archuleta*, the police officer, a member of the Albuquerque Police Department (APD), was in civilian clothes but driving a marked police vehicle on a major street in Albuquerque, New Mexico. 1994-NMCA-072, ¶ 2. The defendant, who was a former police officer, pulled up in his vehicle alongside the police officer. *Id.* ¶¶ 2, 4. The defendant looked at the police officer and then immediately accelerated to a speed that exceeded the posted speed limit. *Id.* ¶ 2. After the police officer turned on his emergency lights, the defendant immediately braked, pulled over to the shoulder, and stopped. *Id.* At that point the police officer put on a windbreaker issued by APD which had "a cloth shield on the front which [said] 'Albuquerque Police' and a patch on the shoulder which [had] the State of New Mexico emblem on it. That emblem also [had] the words 'Albuquerque Police' on it." *Id.* (The opinion does not indicate whether the police

13

officer had his badge attached to his clothing.) When the police officer approached the defendant's vehicle, the defendant argued with the officer that he could not stop him because he was not in uniform. *Id.* ¶ 3.

{24}     In *Maes*, two State Police officers wearing "Basic Duty Uniforms" (BDUs) and driving an unmarked vehicle stopped the defendant for traffic infractions. 2011-NMCA-064, ¶¶ 1, 3. Following a license plate check, the officers learned the defendant had outstanding warrants and arrested him. *Id.* ¶ 3. During a search incident to arrest, they discovered the drugs for which the defendant ultimately was prosecuted. *Id.* The BDUs consisted of black pants, a black vest, a black long-sleeve shirt

> with the words 'STATE POLICE' in large bold yellow lettering on the sleeves, the word 'POLICE' in large bold white lettering on the right shoulder area, a smaller triangular cloth patch with the words 'STATE POLICE' also on the right shoulder; and, on the back of the shirt, the word 'POLICE' in large bold white lettering in two places; an equipment belt, holster, and firearm; and a metal police badge hung from one of the front pockets.

*Id.* ¶ 11. Thus, the practical question in *Archuleta* and *Maes* was not whether, as here, a badge without more suffices as a uniform (indeed, the significance of a badge to the determination of whether a law enforcement officer is in uniform was not addressed at all in either opinion), but whether Section 66-8-124(A) and Section 66-8-125(C) required a *full* uniform as opposed to the APD windbreaker in *Archuleta* or the BDUs

in *Maes*.

{25}    The State argues that Deputy Russ's attire satisfied a two-part test articulated in *Archuleta* for being in a "uniform" as that term is used in these statutes:

> [W]e adopt two alternative tests for determining if an officer is in "uniform" within the intent of the statute; one, whether there are sufficient indicia that would permit a reasonable person to believe the person purporting to be a peace officer is, in fact, who he claims to be; or, two, whether the person stopped and cited either personally knows the officer or has information that should cause him to believe the person making the stop is an officer with official status.

1994-NMCA-072, ¶ 11. With respect to the objective prong of this test, the State argues that a reasonable person would believe that Russ was a law enforcement officer because, like other investigators with the Curry County Sheriff's Office, he was wearing a shirt and tie, a badge, a gun, and handcuffs. "Indeed, the badge alone clearly indicated Russ's official status[.]" We disagree. First, the mere fact that all other Curry County Sheriff's Office investigators wear civilian clothes does not convert those clothes into a "uniform" within the plain meaning of the word, nor, indeed, do we believe it would lead a reasonable person in Curry County or elsewhere to believe that Russ was a law enforcement officer. A shirt and tie do not have the distinctive markings and lettering present on the APD windbreaker and State Police BDU described in *Archuleta* and *Maes*, respectively. Second, as discussed above, pursuant to Section 29-2-13 and Section 29-2-14, a badge is not part of a uniform, but

15

rather a separate indicia of law enforcement officer status. Third, we note that the record in this case is devoid of any description of the badge that Russ wore, in particular, any description of its wording or the size of the lettering. Therefore, we cannot reach any conclusions regarding what information about his law enforcement officer status the badge reasonably may have conveyed to Defendant. Fourth, and similarly, while Undersheriff Reeves testified that Curry County Sheriff's Office investigators normally carry firearms and handcuffs, Russ did not testify and nothing else in the record establishes that he was carrying a gun when he arrested Defendant on September 4, 2013—although Russ did testify that he handcuffed Defendant after the vehicles came to a stop. But even assuming, based on Undersheriff Reeves' habit/routine testimony, *see* Rule 11-406 NMRA, we can infer that Russ had both a gun and handcuffs, for the reasons discussed above, we do not agree that such equipment would suffice to constitute a uniform within the meaning of Section 30-22-1.1(A) in the absence of some distinctive clothing—such as the APD windbreaker or the State Police BDUs—that would identify Russ as a law enforcement officer.

{26} With respect to the subjective prong of the test, the State maintains that the evidence showed that Defendant recognized Deputy Russ as a law enforcement officer, because he did not simply fail to pull over when signaled to stop and instead "reacted to Russ's presence by turning down various streets, driving through stop

16

signs, and accelerating to 55 miles per hour." The mere fact that a motorist speeds away from a vehicle that engages emergency lights does not prove that he or she knows that the driver of the other vehicle is a law enforcement officer. Another plausible inference is that the motorist suspects that the driver is someone who is only posing as a law enforcement officer. Moreover, it certainly would not follow from Defendant's response that he recognized Russ—who was still inside the vehicle—as a law enforcement officer on the basis of his clothing, badge and equipment as opposed to Russ engaging his vehicle's flashing and alternating lights. The State's argument effectively would eliminate the uniform element of the aggravated fleeing crime, a proposition we decline to accept. In any event, there is no evidence in the record to support the State's supposition. In fact, Russ testified that he did not know what Defendant was thinking.

{27} Our more fundamental concern with applying the two-part *Archuleta* test to Section 30-22-1.1(A) is that it permits a determination that a law enforcement officer is in "uniform" to be made on the basis of considerations unrelated to what he or she is wearing. In *Archuleta*, the court relied on the fact that the officer was driving a "marked police unit" in concluding that both the objective and the subjective prongs of the test were met. 1994-NMCA-072, ¶¶ 11-12. Section 30-22-1.1(A), however, requires that an officer be both "uniformed" *and* in "an appropriately marked law

enforcement vehicle." "The [L]egislature is presumed not to have used any surplus words and each word has a meaning." *State v. Doe*, 1977-NMCA-092, ¶ 6, 90 N.M. 776, 568 P.2d 612. "We will not assume that the [L] has adopted useless language in the statute." *In re Francesca L.*, 2000-NMCA-019, ¶ 10, 128 N.M. 673, 997 P.2d 147, *overruled on other grounds by State v. Adam J.*, 2003-NMCA-080, ¶ 10, 133 N.M. 815, 70 P.3d 805.

{28}     Lastly, the State points to the discussion in *Archuleta* of the 1968 amendment of Section 66-8-124(A) as support for its position that Deputy Russ's badge, without more, constituted a uniform. *See Archuleta*, 1994-NMCA-072, ¶ 10. As discussed above, in 1968 the Legislature amended Section 66-8-124(A), which prohibits arrests for violations of the Motor Vehicle Code except by a uniformed peace officer, by deleting its second sentence which had read, "[I]n the [M]otor [V]ehicle [C]ode, 'uniform' means an official badge prominently displayed, accompanied by a commission of office." *Archuleta*, 1994-NMCA-072, ¶ 10. The *Archuleta* panel noted this amendment and commented, "We believe that the deletion of that language suggested that the [L]egislature intended the definition of 'uniform' to be *less restrictive*, no doubt recognizing that modern day police officers may have more than one uniform or may on occasion wear combinations thereof." *Id.* (emphasis added). The State seizes on this language:

18

> Deputy Russ's attire clearly would have qualified as a uniform under this [pre-1968] definition, because he was a certified peace officer, wearing his badge on his chest pocket, 'prominently displayed'. . . . Logically, if Deputy Russ's attire qualified as a uniform under this more restrictive definition, it also must qualify under today's *less restrictive* definition.

{29} We respectfully question this inference in *Archuleta*. Prior to the 1968 amendment, a law enforcement officer attired in gym shorts and a t-shirt perhaps could arrest a motorist for a misdemeanor violation of the Motor Vehicle Code or other law relating to motor vehicles so long as he or she displayed a badge of office; after the amendment, we submit, this would not be permitted. Thus, it is difficult to understand how *eliminating* language that a badge, without more, constitutes a uniform makes less restrictive the requirement in Section 66-8-124(A) that the law enforcement officer be in uniform. Again, the more straightforward inference is that the Legislature wanted to make clear, consistent with its enactment of Section 29-2-14(A) three years later, that a badge is *not* a uniform or even part of a uniform. (The amendment also made Section 66-8-124(A) consistent with Section 66-8-125(C).) In any event, we do not believe that this comment in *Archuleta* was intended to suggest that a badge, without more, constitutes a uniform. Indeed, there was no reference at all in the case to whether the police officer in question had a badge on his person, and instead the issue was whether the APD windbreaker qualified as a uniform. In that context, and given the panel's observation that "modern day" police officers have

19

more than one uniform, we understand the "less restrictive" point to be only that Section 66-8-124(A) does not require that a law enforcement officer be in *full* uniform to make an arrest for violating the Motor Vehicle Code.[1] *Archuleta*, 1994-NMCA-072, ¶ 10.

{30}     To be clear, we have no quarrel with the conclusion in *Archuleta* and *Maes* that a law enforcement officer need not be in *full* uniform in order to stop, cite, and/or arrest a motorist for a misdemeanor traffic or other motor vehicle violation pursuant to Section 66-8-124(A) and Section 66-8-125(C) or to satisfy the "uniformed" element of Section 30-22-1.1(A). The APD officer's windbreaker in *Archuleta* and the State Police officers' BDU uniform in *Maes* sufficed. However, because it conflicts with the plain meaning of "uniform," we decline to extend *Archuleta*'s two-part test to construction of Section 30-22-1.1(A).[2]

---

[1]We note as well that the second sentence of Section 66-8-124(A) was never applicable to more than the Motor Vehicle Code, i.e., it cannot be invoked to support interpretation of Sections 30-22-1(C) or -1.1(A).

[2]The State's final argument regarding the uniform issue relies on Section 29-2-14, which prohibits, as a petty misdemeanor, wearing a badge without authorization. The State reasons that Deputy Russ's badge, clearly indicated his official status, and, therefore, qualified as a uniform. The logic is flawed. First, Section 29-2-14 applies only to State Police uniforms. To our knowledge, it is not a crime to wear a Clovis County Sheriff's Office badge without authorization. Second, and more fundamentally, it ignores the distinction drawn, by not only Section 29-2-14 but also Section 29-2-13, between a badge and a uniform. Whether or not a law enforcement officer's badge might indicate his or her official status, Section 30-22-1.1(A) still requires, as an element of the crime, that the pursuing officer be in uniform, and a

**D. Applying the Plain Meaning of "Uniform" to Sections 30-22-1.1A and 30-22-1(C) Does Not Lead to a Result That Is Absurd or Contrary to Clearly Manifested Legislative Intent**

{31}     While "the plain meaning rule is not absolute," it is the norm. *Chavez v. Mountain States Constructors*, 1996-NMSC-070, ¶ 24, 122 N.M. 579, 929 P.2d 971. "We may depart from the plain language only under rare and exceptional circumstances." *Padilla*, 2008-NMSC-006, ¶ 41, (Chavez, J., dissenting) (internal quotation marks and citation omitted). Thus, we give effect to the meaning of the words of a statute "unless this leads to an absurd or unreasonable result." *State v. Marshall*, 2004-NMCA-104, ¶ 7, 136 N.M. 240, 96 P.3d 801; *accord Chavez*, 1996-NMSC-070, ¶ 24 (explaining that a court will "avoid any literal interpretation that leads to an absurd or unreasonable result and threatens to convict the [L]egislature of imbecility" (internal quotation marks and citation omitted)).

{32}     Does application of the plain meaning of "uniform" to Section 30-22-1.1(A) necessarily yield an unreasonable or absurd result? No. Requiring as an element of the crime that the pursuing officer be in uniform, i.e., clothing that in addition to a badge objectively identifies him or her as a law enforcement officer, is unreasonable only if one assumes that the intent of the statute is to criminalize all refusals to comply with a signal to stop, even by a nonuniformed officer. But that would render

uniform is not the same as a badge.

meaningless, contrary to the foregoing rules of construction, the word "uniformed" in the statute. It also would conflict with Section 29-2-13 and Section 29-2-14, which distinguish between uniforms and badges. Thus, if anything, the absurd or unreasonable result is reached by *not* applying the plain meaning of "uniform." An interpretation of Section 30-22-1.1(A) that imposes the felony sanction only where it is clear (from, among other indicators, the uniform) that the person who has signaled the motorist to stop is a law enforcement officer is reasonable and, in fact, advances the apparent legislative intent.

{33} We emphasize that construing Section 30-22-1.1(A) in accordance with the plain meaning of "uniform" does not give motorists license to simply ignore law enforcement officers who signal them to stop. Section 66-7-332(A) remains in effect and requires motorists to pull over whenever any emergency vehicle, including a law enforcement vehicle whether or not its occupant is in uniform, has engaged its lights and/or sirens. Section 66-8-125 remains in effect as well: all law enforcement officers, whether or not in uniform, retain their authority to make arrests for all nontraffic offenses and all felonies where probable cause exists. Giving effect to the plain meaning of "uniform" in Section 30-22-1.1(A) prevents a law enforcement officer who is not in a uniform only from arresting a motorist for violation of Section

30-22-1.1(A) itself.[3] This is not an absurd result. Rather, it gives meaning to the Legislature's inclusion of the word "uniformed" in the statutes and carries out the apparent intent in doing so: to "establish[ ] a defendant's knowledge that he is fleeing a police officer." *Padilla*, 2008-NMSC-006, ¶ 22.

{34}    It matters not that an argument might be made that it would be better policy to allow nonuniformed law enforcement officers to make arrests for violation of Section 30-22-1.1(A). "[W]e must assume the [L]egislature chose its words advisedly to express its meaning unless the contrary intent clearly appears." *State v. Maestas*, 2007-NMSC-001, ¶ 22, 140 N.M. 836, 149 P.3d 933 (alterations, internal quotation marks, and citation omitted). "[A] statute must be read and given effect as it is written by the Legislature, not as the court may think it should be or would have been written if the Legislature had envisaged all the problems and complications which might arise in the course of its administration." *Id.* ¶ 14 (internal quotation marks and citation omitted). Stated another way, courts generally "are not at liberty to disregard the plain meaning of words in order to search for some other conjectured intent." *State v. Carroll*, 2015-NMCA-033, ¶ 4, 346 P.3d 372 (omission omitted).

[3]Even if the plain meaning of uniform were applied to Section 66-8-124(A) and Section 66-8-125(C), a question we do not address herein, a law enforcement officer who is not in a uniform still would be prevented only from arresting a motorist for a nonfelony Motor Vehicle Code or other traffic or motor vehicle offense.

## II.   APPROPRIATELY MARKED LAW ENFORCEMENT VEHICLE

{35}   We now address whether an "unmarked" police vehicle, that is, one with no lettering or insignia anywhere on the exterior, nevertheless may constitute an "appropriately marked" law enforcement vehicle for purposes of Section 30-22-1.1(A). The aggravated fleeing statute does not define "appropriately marked." As previously mentioned, the term appears in Section 30-22-1(C) but is not defined in that statute either.

### A.   The Plain Meaning of "Appropriately Marked"

{36}   Our analysis again begins with the plain meaning of "appropriately marked." *Webster's Third New International Dictionary* 1383 (Unabridged ed. 1986) defines "marked" as "having a mark." More usefully, *Webster's* then broadly defines "mark" as "something that gives evidence of something else." *Marked*, *Webster's Third New Int'l Dictionary* 1382 (Unabridged ed. 1986). Within that general definition, *Webster's* provides the following subdefinition, among others: "a character, *device*, label, brand, seal, or other sign put on an article esp[ecially] to show the maker or owner, to certify quality, or for identification[.]" *Id.* (emphasis added). The reference in this subdefinition to "device" is notable, in that a mark is not necessarily graphic, or even visual. "Appropriate" means "specially suitable," and "appropriately" means "in an appropriate manner." *Webster's Third New Int'l Dictionary* 106 (Unabridged

24

ed. 1986).

{37} In the context of Section 30-22-1.1(A), we understand the plain meaning of "appropriately marked" to be that the vehicle in question is marked in a manner that is suitable for being driven by a law enforcement officer and identified as such. We consider it significant that the Legislature did not specifically refer to insignia or lettering, and instead used only the broader term, "mark." Emergency lights and a siren are devices that can evidence, i.e., identify, a law enforcement vehicle. Thus, absent some basis for not applying the plain meaning rule, Deputy Russ's vehicle was "appropriately marked" as that term is used in Section 30-22-1.1(A).

**B.      Resolving the Ambiguity in "Appropriately Marked"**

{38} Notwithstanding our conclusion that the plain meaning of "appropriately marked," as used in Section 30-22-1.1(A), encompasses emergency lights and sirens, we acknowledge that a "marked" police car commonly refers to a vehicle with lettering, insignia, or striped paint that would indicate the driver of the vehicle is a law enforcement officer, and conversely an "unmarked" police car refers to a vehicle without any such graphic markings on the exterior. *See, e.g.*, *People v. Mathews*, 75 Cal. Rptr. 2d 289, 291 (Cal. Ct. App. 1998) (addressing whether "an unmarked police vehicle equipped with a siren, a red light mounted on the front dashboard, and headlights which flashed in an alternating, 'wigwag' pattern" was "distinctively

25

marked" within the meaning of California's analog to Section 30-22-1.1(A) (internal quotation marks and citation omitted)). Indeed, the district court acknowledged this colloquial terminology during Defendant's trial, concluding that Deputy Russ's Ford Expedition "was not a marked vehicle." *See* 10.5.400.8(C)(1)(a) NMAC (Department of Public Safety regulation specifying that "both marked and unmarked [State Police vehicles]" will be used only for official business).

{39} A statute's ambiguity is one circumstance in which we will not apply the plain meaning rule to construe it. "We do not depart from the plain language of a statute unless we must resolve an ambiguity[.]" *Progressive Nw. Ins. Co. v. Weed Warrior Servs.*, 2010-NMSC-050, ¶ 6, 149 N.M. 157, 245 P.3d 1209 (internal quotation marks and citation omitted). "A statute is ambiguous when it can be understood by reasonably well-informed persons in two or more different senses." *Maestas v. Zager*, 2007-NMSC-003, ¶ 9, 141 N.M. 154, 152 P.3d 141 (internal quotation marks and citation omitted). Given the divergence between the plain meaning and the common understanding of a marked law enforcement vehicle, the phrase "appropriately marked" in Section 30-22-1.1(A) is ambiguous.

{40} "When a statute's language is ambiguous or unclear, we look to legislative intent to inform our interpretation of the statute." *Ortiz v. Overland Express*, 2010-NMSC-021, ¶ 18, 148 N.M. 405, 237 P.3d 707; *see also Helen G. v. Mark J.H.*, 2006-

NMCA-136, ¶ 11, 140 N.M. 618, 145 P.3d 98 (noting that ambiguous provisions require the court to ascertain a statute's legislative purpose), *rev'd on other grounds by* 2008-NMSC-002, 143 N.M. 246, 175 P.3d 914. In *Padilla*, our Supreme Court articulated the legislative intent behind Section 30-22-1.1(A)'s "appropriately marked" requirement in the context of its discussion of the statute's scienter requirement:

> [T]he officer's conduct, wearing his uniform, being in a marked car, and signaling the defendant to stop, establishes a defendant's knowledge that he is fleeing a police officer. As such, it is a fair inference that *the Legislature intended to make those parts of the officer's conduct that establishes scienter*, i.e., the accused's knowledge that he is fleeing an officer, *elements of the crime of aggravated fleeing*.

*Padilla*, 2008-NMSC-006, ¶ 22 (emphases added). Thus, the intent of Section 30-22-1.1(A)'s requirement that the police vehicle be "appropriately marked" is the same as that statute's requirement that the officer be in uniform: to establish that the motorist knows that he is fleeing a law enforcement officer.

{41}     Given this intent, are the siren and flashing emergency lights on Deputy Russ's vehicle properly understood to be "appropriate marks" that identified it as a law enforcement vehicle? Defendant argues generally that a motorist cannot know that a vehicle that lacks identifying insignia or lettering is a law enforcement vehicle, because "lots of vehicles have flashing lights." Defendant's point is that, without an insignia or lettering specifically indicative of law enforcement, it is not possible to

distinguish a vehicle with flashing lights from, for example, fire department vehicles or ambulances. Thus, Defendant would have us conclude it is necessary for a vehicle to have insignia or lettering in order to meet the legislative intent: establishing that it is a law enforcement officer who is pursuing the motorist and signaling him or her to stop.

{42} We are not persuaded. Pursuant to Section 66-7-332(A) discussed above, a motorist who sees a vehicle with flashing emergency lights and/or hears its siren must pull off the road and stop. Therefore, whether the motorist can differentiate a police vehicle from, say, an ambulance, is of no consequence for purposes of establishing the initial obligation to stop. Stated another way, a law enforcement vehicle is "appropriately marked" so long as it has sufficient equipment to trigger the motorist's obligation under Section 66-7-332 to come to a stop. Once the motorist's and the law enforcement officer's vehicles have come to a stop and the officer (assuming he is in uniform) emerges from his vehicle, the officer's identity as law enforcement will be confirmed. If at that point the motorist drives off, he or she will violate Section 30-22-1(C) and, potentially, Section 30-22-1.1(A). Thus, a vehicle equipped with emergency lights, flashing lights, and siren, i.e., one consistent with the plain meaning of "appropriately marked," also meets the legislative intent underlying Section 30-22-1.1(A).

28

{43} We also observe that Deputy Russ's vehicle in any event had multiple sets of specialized lights to distinguish it from civilian and other emergency vehicles. He described the vehicle as being equipped with red and blue flashing lights. In addition, the vehicle was equipped with wigwag headlights that flashed in an alternating sequence. Defendant did not establish on cross-examination of Russ or Undersheriff Reeves, or through other evidence presented as part of the defense case, whether any non-law-enforcement emergency vehicles have flashing red and blue emergency lights that are located inside the vehicle or on its grill as opposed to on the top of the vehicle. Regardless, we can note that the absence of any flashing lights attached to the *top* of the vehicle would appear to distinguish Russ's vehicle from any other emergency vehicle. Further, Defendant did not establish that any emergency vehicles other than law enforcement vehicles are equipped with wigwag headlights. On the basis of similar facts, the court in *People v. Estrella*, 37 Cal. Rptr. 2d 383, 386-87 (Cal. Ct. App. 1995), concluded that an "unmarked" vehicle was "distinctively marked" within the meaning of California's aggravating fleeing statute, Cal. Vehicle Code § 2800.1(a)(3) (2006): "We find it incredible to believe or even seriously argue that a reasonable person, upon seeing a vehicle in pursuit with flashing red and blue lights, wigwag headlights and hearing a siren, would have any doubt that said pursuit vehicle was a police vehicle." *Estrella*, 37 Cal. Rptr. 2d at 386, 388 (distinguishing

flashing red and blue lights on a light bar ("emergency lights") from the wigwag lights ("alternating lights")). For these reasons, we conclude that the siren along with the combination of flashing and alternating lights on Russ's vehicle were sufficient to enable Defendant to know immediately, not only that it was an emergency vehicle, but that it was a law enforcement vehicle in particular. That is, even assuming a siren and emergency flashing lights would not meet Section 30-22-1.1(A)'s legislative intent, Russ's siren, flashing lights *and* wigwag lights would accomplish this goal and thus satisfy the "appropriately marked" element of the crime.

**C.      Section 30-22-1.1(A)'s "Visual or Audible Signal to Stop" Language Is Not Surplusage**

{44}      New Mexico courts will avoid construing one portion of a statute in a manner that renders another portion superfluous. *State v. Juan*, 2010-NMSC-041, ¶ 39, 148 N.M. 747, 242 P.3d 314; *State v. Indie C.*, 2006-NMCA-014, ¶ 14, 139 N.M. 80, 128 P.3d 508. Defendant argues that, if "appropriately marked" is not construed to require that the law enforcement vehicle have insignia or lettering and instead that element of Section 30-22-1.1(A) is satisfied by flashing lights and siren, then the requirement that the officer give the motorist "a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal," will be rendered surplusage and meaningless. Section 30-22-1.1(A).

{45}      We disagree for several reasons. First, as the State points out, under Section 30-

30

22-1.1(A), the "visual or audible signal to stop" may be given by any number of means, including hand or voice. Thus, the flashing lights and/or siren that satisfy the appropriately marked vehicle element will not necessarily be the, or at least the only, visual or audible signal to stop that the officer gives. Second, and related, Section 30-22-1.1(A)'s examples of the visual or audible signal to stop are set out in the disjunctive. For example, only a siren, an emergency light *or* a flashing light is required. The siren, flashing red and blue lights, *and* wigwag lights activated on Deputy Russ's vehicle therefore were not all required to satisfy the "visual or audible signal to stop" element. Third, and more fundamentally, in our view the fact that in the case at bar the flashing lights might serve the purposes underlying both elements—communicating the instruction to stop *and* making clear that the person giving the instruction is a law enforcement officer—does not render either element of the crime superfluous or meaningless. *See People v. Hudson*, 136 P.3d 168, 177 (Cal. 2006) (Moreno, J., dissenting) (concluding that "the requirement that a police vehicle must be distinctively marked can be satisfied, in part, by the same evidence used to establish the additional requirements that the vehicle exhibit a red lamp . . . and sound a siren"). Thus, it is not necessary to construe "appropriately marked" to require that the law enforcement vehicle have insignia or lettering to avoid rendering meaningless "a visual or audible signal to stop."

{46}     We are sensitive to the public concern expressed over the past several decades about persons posing as law enforcement officers in vehicles equipped with emergency lights and sirens who stop and prey upon other motorists. "It is an all too sad fact that persons have been victimized as a result of their trusting criminals who were impersonating police officers to facilitate crimes." *A.F. v. State*, 905 So. 2d 1010, 1012 (Fla. Dist. Ct. App. 2005) (internal quotation marks and citation omitted); *see also Archuleta*, 1994-NMCA-072, ¶ 15 (noting the risk to the public posed by police impersonators); *State v. Kenneth*, No. A-1-CA-33281, mem. op. (N.M. Ct. App. Nov. 12, 2015) (nonprecedential) (affirming conviction of person who posed as police officer and sexually assaulted a motorist). However, we have no evidence that this consideration entered into the motivation of any of the members of our Legislature in enacting Section 30-22-1.1(C). For this reason, it does not inform our construction of Section 30-22-1.1(A). Our Legislature nevertheless may wish to consider imposing sanctions, beyond the petty misdemeanor established by Section 29-2-14(A) for wearing a uniform or badge that appears to be that of a New Mexico State Police officer, on individuals who impersonate law enforcement officers by means of vehicle equipment and attire. Such a law would tend to promote the legislative goal—ensuring that motorists stop when they see another vehicle with emergency lights or siren engaged—underlying Section 66-7-332, Section 30-22-

32

1(C), and Section 30-22-1.1(A).

**CONCLUSION**

{47}    The foregoing rules of statutory construction require that, as used in Section 30-22-1.1(A), "uniformed" and "appropriately marked" cannot be stripped of all meaning, and instead will be interpreted in accordance with their plain meaning. So construed, however, these phrases do not mandate that the law enforcement officer who signals the motorist to stop must be in full or formal uniform and in a fully marked vehicle. The statute requires only that the officer be in a vehicle that objectively establishes that the vehicle is an emergency vehicle for which, pursuant to Section 66-7-332(A), the motorist must pull off to the side of the road and stop; and wearing a uniform that, by the time the officer emerges from the vehicle, objectively establishes that he is in fact a law enforcement officer. The sirens, flashing red and blue emergency lights, and alternating wigwag headlights on Deputy Russ's vehicle met Section 30-22-1.1(A)'s "appropriately marked" standard. While the informal uniforms at issue in *Archuleta* and *Maes* would have met the statute's "uniformed" standard, Russ's street clothes and equipment, even with his badge affixed to his shirt, did not.

{48}    We reverse Defendant's conviction for aggravated fleeing in violation of Section 30-22-1.1(A).

33

{49}    **IT IS SO ORDERED.**


_____

**HENRY M. BOHNHOFF, Judge**


**WE CONCUR:**


_____

**LINDA M. VANZI, Chief Judge**


**STEPHEN G. FRENCH, Judge (dissenting)**

**FRENCH, Judge (concurring in part and dissenting in part).**

{50}     I concur in the Majority Opinion's application of "appropriately marked" to the vehicle driven by Deputy Russ relative to the aggravated fleeing statute, as that term appears in Section 30-22-1.1(A). In dissenting, I take issue with the Majority Opinion's holding that Deputy Russ was not in uniform when he pursued and arrested Defendant for aggravated fleeing.

{51}     To determine whether Deputy Russ—adorned in a dress shirt, pants, a tie, and accessorized by his holster, sidearm, extra sidearm magazines, handcuffs, and his official sheriff's department badge pinned upon his chest—was in uniform for purposes of Section 30-22-1.1(A), our precedent uniformly, plainly, and consistently directs application of a straightforward objective test. Rejected by the Majority today, the test asks simply whether sufficient indicia of law enforcement authority was displayed such that a reasonable person ought conclude that the person purporting to be a peace officer in fact is. Yet today, the Majority upends that which a reasonable person might readily conclude for a rigid, cloth-specific, requirement that officers dress only in clothing that is itself marked, and diminishes law enforcement authority when those officers wear something other than that exact uniform. Specifically, because Deputy Russ's clothing did not demonstrably reiterate what his badge made clear, the Majority concludes he was not a "uniformed law enforcement officer"

35

pursuant to Section 30-22-1.1(A). To so hold, the Majority discards this Court's objective test and applies a dictionarial approach to glean the plain meaning of uniform—as the dress or actual cloth worn—to the exclusion of Deputy Russ's official badge. I respectfully dissent.

{52} "Our primary goal when interpreting statutory language is to give effect to the intent of the [L]egislature." *State v. Torres*, 2006-NMCA-106, ¶ 8, 140 N.M. 230, 141 P.3d 1284. "We do this by giving effect to the plain meaning of the words of [the] statute, unless this leads to an absurd or unreasonable result." *Marshall*, 2004-NMCA-104, ¶ 7. In *Archuleta*, we first construed the plain meaning of uniform—"uniform plainly indicating his official status"—to give effect to the intention of the Legislature. 1994-NMCA-072, ¶ 9; s*ee id.* ("[T]he intention of the [L]egislature in requiring the officer to wear a uniform plainly indicating his official status was to enable the motorist to be certain that the officer who stops him is, in fact, a police officer."). The officer making the stop in *Archuleta* was dressed in plain clothes bearing no indicia that he was an officer. 1994-NMCA-072, ¶ 2. Upon exiting his patrol car, he donned a police department windbreaker with a cloth shield on the front indicating "Albuquerque Police" and cloth shoulder patch to the same effect. *Id.* Applying our objective test to discern the legislative intent in the plain meaning of the words—"uniform clearly indicating the peace officer's official status[,]" and "in

36

uniform[,]"—we held that sufficient indicia of law enforcement authority was clearly evinced with the addition of the cloth shield and patch. Sections 66-8-124(A) and -125(C); *see also Archuleta*, 1994-NMCA-072, ¶¶ 11-12. Here, Deputy Russ's official Curry County Sheriff's badge was at all times prominently displayed on his chest. Indeed, subsequent to Defendant's willful and careless fleeing and crashing his car, when Deputy Russ ordered Defendant to "show his hands" he did so, evidencing his compliance with and acknowledgment of the officer's official status and directive.

{53} In noting that the Legislature had removed language from what is now Section 66-8-124—which provided "uniform means an official badge prominently displayed, accompanied by a commission of office"—the *Archuleta* Court concluded that the Legislature intended the definition of "uniform" to be "less restrictive, no doubt recognizing that modern day police officers may have more than one uniform or may on occasion wear combinations thereof." 1994-NMCA-072, ¶ 10 (internal quotation marks omitted).

{54} In affirming this expression of legislative intent and applying *Archuleta's* objective test for determining whether an officer is in uniform, our Court in Maes held that non-traditional dress or garments, adorned with police lettering and accompanied by police badge, would constitute a uniform as that term is used in Section 66-8-124(A) and Section 66-8-125(C). *Maes*, 2011-NMCA-064, ¶¶ 9-11; *see*

*id.* ¶ 11 (holding garments consisting of cloth marked with "STATE POLICE" and "POLICE[,]" equipment belt, holster, firearm, and metal police badge, satisfied objective test that reasonable person would believe that person wearing such garments is, in fact, a police officer).

{55}   There can be little doubt that we may infer that Deputy Russ's official badge conveyed words and symbols to the same effect as the cloth shield on the windbreaker in *Archuleta* or cloth garments in *Maes*—such as "Sheriff's Department" or "Sheriff." The Majority's rejection of the objective sufficient indicia of law enforcement authority test, in favor of a plain meaning of the word "uniformed" analysis, is inapposite to our Court's precedent. In so doing, the Majority would displace this Court's prior discernment of legislative intent for "uniform" and "in uniform," thus leading "to an absurd or unreasonable result." *Marshall*, 2004-NMCA-104, ¶ 7. Here, the unreasonable result is manifest: indicia of law enforcement authority that is stitched into or printed upon a clothing garment itself is sufficient to being "uniformed," whereas indicia of law enforcement authority imprinted or stamped into an official badge, or the forged official badge itself, pinned upon a clothing garment is not, regardless of the attendant sidearm, holster, and other law enforcement tools.

{56}   Because I would hold that the tie, dress shirt, dress pants, badge, and the accouterments of law enforcement authority worn and displayed by Deputy Russ

38

would sufficiently notify any reasonable person that the man they encountered was not Mr. Russ, but Deputy Russ, I respectfully dissent.

_____
**STEPHEN G. FRENCH, Judge**